7/23/2021 3:54:57 PM

# Compare Results

Old File:

**19-1257.pdf**

**85 pages (645 KB)**

6/30/2021 5:30:50 PM

versus

New File:

**19-1257_new.pdf**

**85 pages (685 KB)**

7/23/2021 3:52:41 PM

| **Total Changes** | **Content** | | **Styling and Annotations** | |
|---|---|---|---|---|
| **1** | 1 | Replacement | 0 | Styling |
| | 0 | Insertions | 0 | Annotations |
| | 0 | Deletions | | |

Go to First Change (page 49)

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BRNOVICH, ATTORNEY GENERAL OF ARIZONA, ET AL. *v.* DEMOCRATIC NATIONAL COMMITTEE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 19–1257.  Argued March 2, 2021—Decided July 1, 2021*

Arizona law generally makes it very easy to vote.  Voters may cast their ballots on election day in person at a traditional precinct or a "voting center" in their county of residence.  Ariz. Rev. Stat. §16–411(B)(4). Arizonans also may cast an "early ballot" by mail up to 27 days before an election, §§16–541, 16–542(C), and they also may vote in person at an early voting location in each county, §§16–542(A), (E).  These cases involve challenges under §2 of the Voting Rights Act of 1965 (VRA) to aspects of the State's regulations governing precinct-based election-day voting and early mail-in voting.  First, Arizonans who vote in person on election day in a county that uses the precinct system must vote in the precinct to which they are assigned based on their address.  See §16–122; see also §16–135.  If a voter votes in the wrong precinct, the vote is not counted.  Second, for Arizonans who vote early by mail, Arizona House Bill 2023 (HB 2023) makes it a crime for any person other than a postal worker, an elections official, or a voter's caregiver, family member, or household member to knowingly collect an early ballot— either before or after it has been completed. §§16–1005(H)–(I).

The Democratic National Committee and certain affiliates filed suit, alleging that both the State's refusal to count ballots cast in the wrong precinct and its ballot-collection restriction had an adverse and disparate effect on the State's American Indian, Hispanic, and African-American citizens in violation of §2 of the VRA.  Additionally, they alleged that the ballot-collection restriction was "enacted with discriminatory

—————
*Together with No. 19–1258, *Arizona Republican Party et al.* v. *Democratic National Committee et al.*, also on certiorari to the same court.

intent" and thus violated both §2 of the VRA and the Fifteenth Amendment. The District Court rejected all of the plaintiffs' claims. The court found that the out-of-precinct policy had no "meaningfully disparate impact" on minority voters' opportunities to elect representatives of their choice. Turning to the ballot-collection restriction, the court found that it was unlikely to cause "a meaningful inequality" in minority voters' electoral opportunities and that it had not been enacted with discriminatory intent. A divided panel of the Ninth Circuit affirmed, but the en banc court reversed. It first concluded that both the out-of-precinct policy and the ballot-collection restriction imposed a disparate burden on minority voters because they were more likely to be adversely affected by those rules. The en banc court also held that the District Court had committed clear error in finding that the ballot-collection law was not enacted with discriminatory intent.

*Held*: Arizona's out-of-precinct policy and HB 2023 do not violate §2 of the VRA, and HB 2023 was not enacted with a racially discriminatory purpose. Pp. 12–37.

(a) Two threshold matters require the Court's attention. First, the Court rejects the contention that no petitioner has Article III standing to appeal the decision below as to the out-of-precinct policy. All that is needed to entertain an appeal of that issue is one party with standing. *Little Sisters of the Poor Saints Peter and Paul Home* v. *Pennsylvania*, 591 U. S. ___, ___, n. 6. Attorney General Brnovich, as an authorized representative of the State (which intervened below) in any action in federal court, fits the bill. See *Virginia House of Delegates* v. *Bethune-Hill*, 587 U. S. ___, ___. Second, the Court declines in these cases to announce a test to govern all VRA §2 challenges to rules that specify the time, place, or manner for casting ballots. It is sufficient for present purposes to identify certain guideposts that lead to the Court's decision in these cases. Pp. 12–13.

(b) The Court's statutory interpretation starts with a careful consideration of the text. Pp. 13–25.

(1) The Court first construed the current version of §2 in *Thornburg* v. *Gingles*, 478 U. S. 30, which was a vote-dilution case where the Court took its cue from §2's legislative history. The Court's many subsequent vote-dilution cases have followed the path *Gingles* charted. Because the Court here considers for the first time how §2 applies to generally applicable time, place, or manner voting rules, it is appropriate to take a fresh look at the statutory text. Pp. 13–14.

(2) In 1982, Congress amended the language in §2 that had been interpreted to require proof of discriminatory intent by a plurality of the Court in *Mobile* v. *Bolden*, 446 U. S. 55. In place of that language, §2(a) now uses the phrase "in a manner which results in a denial or

abridgement of the right . . . to vote on account of race or color." Section 2(b) in turn explains what must be shown to establish a §2 violation. Section 2(b) states that §2 is violated only where "the political processes leading to nomination or election" are not "*equally open* to participation" by members of the relevant protected group "*in that its members have less opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice." (Emphasis added.) In §2(b), the phrase "in that" is "used to specify the respect in which a statement is true." New Oxford American Dictionary 851. Thus, equal openness and equal opportunity are not separate requirements. Instead, it appears that the core of §2(b) is the requirement that voting be "equally open." The statute's reference to equal "opportunity" may stretch that concept to some degree to include consideration of a person's ability to use the means that are equally open. But equal openness remains the touchstone. Pp. 14–15.

(3) Another important feature of §2(b) is its "totality of circumstances" requirement. Any circumstance that has a logical bearing on whether voting is "equally open" and affords equal "opportunity" may be considered. Pp. 15–21.

(i) The Court mentions several important circumstances but does not attempt to compile an exhaustive list. Pp. 15–19.

(A) The size of the burden imposed by a challenged voting rule is highly relevant. Voting necessarily requires some effort and compliance with some rules; thus, the concept of a voting system that is "equally open" and that furnishes equal "opportunity" to cast a ballot must tolerate the "usual burdens of voting." *Crawford* v. *Marion County Election Bd.*, 553 U. S. 181, 198. Mere inconvenience is insufficient. P. 16.

(B) The degree to which a voting rule departs from what was standard practice when §2 was amended in 1982 is a relevant consideration. The burdens associated with the rules in effect at that time are useful in gauging whether the burdens imposed by a challenged rule are sufficient to prevent voting from being equally "open" or furnishing an equal "opportunity" to vote in the sense meant by §2. Widespread current use is also relevant. Pp. 17–18.

(C) The size of any disparities in a rule's impact on members of different racial or ethnic groups is an important factor to consider. Even neutral regulations may well result in disparities in rates of voting and noncompliance with voting rules. The mere fact that there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote. And small disparities should not be artificially magnified. P. 18.

(D) Consistent with §2(b)'s reference to a States' "political

processes," courts must consider the opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision. Thus, where a State provides multiple ways to vote, any burden associated with one option cannot be evaluated without also taking into account the other available means. P. 18.

(E) The strength of the state interests—such as the strong and entirely legitimate state interest in preventing election fraud—served by a challenged voting rule is an important factor. Ensuring that every vote is cast freely, without intimidation or undue influence, is also a valid and important state interest. In determining whether a rule goes too far "based on the totality of circumstances," rules that are supported by strong state interests are less likely to violate §2. Pp. 18–19.

(ii) Some factors identified in *Thornburg* v. *Gingles,* 478 U. S. 30, were designed for use in vote-dilution cases and are plainly inapplicable in a case that involves a challenge to a facially neutral time, place, or manner voting rule. While §2(b)'s "totality of circumstances" language permits consideration of certain other *Gingles* factors, their only relevance in cases involving neutral time, place, and manner rules is to show that minority group members suffered discrimination in the past and that effects of that discrimination persist. The disparate-impact model employed in Title VII and Fair Housing Act cases is not useful here. Pp. 19–21.

(4) Section 2(b) directs courts to consider "the totality of circumstances," but the dissent would make §2 turn almost entirely on one circumstance: disparate impact. The dissent also would adopt a least-restrictive means requirement that would force a State to prove that the interest served by its voting rule could not be accomplished in any other less burdensome way. Such a requirement has no footing in the text of §2 or the Court's precedent construing it and would have the potential to invalidate just about any voting rule a State adopts. Section 2 of the VRA provides vital protection against discriminatory voting rules, and no one suggests that discrimination in voting has been extirpated or that the threat has been eliminated. Even so, §2 does not transfer the States' authority to set non-discriminatory voting rules to the federal courts. Pp. 21–25.

(c) Neither Arizona's out-of-precinct policy nor its ballot-collection law violates §2 of the VRA. Pp. 25–34.

(1) Having to identify one's polling place and then travel there to vote does not exceed the "usual burdens of voting." *Crawford*, 553 U. S., at 198. In addition, the State made extensive efforts to reduce the impact of the out-of-precinct policy on the number of valid votes ultimately cast, *e.g.,* by sending a sample ballot to each household that includes a voter's proper polling location. The burdens of identifying

and traveling to one's assigned precinct are also modest when considering Arizona's "political processes" as a whole. The State offers other easy ways to vote, which likely explains why out-of-precinct votes on election day make up such a small and apparently diminishing portion of overall ballots cast.

Next, the racial disparity in burdens allegedly caused by the out-of-precinct policy is small in absolute terms. Of the Arizona counties that reported out-of-precinct ballots in the 2016 general election, a little over 1% of Hispanic voters, 1% of African-American voters, and 1% of Native American voters who voted on election day cast an out-of-precinct ballot. For non-minority voters, the rate was around 0.5%. A procedure that appears to work for 98% or more of voters to whom it applies—minority and non-minority alike—is unlikely to render a system unequally open.

Appropriate weight must be given to the important state interests furthered by precinct-based voting. It helps to distribute voters more evenly among polling places; it can put polling places closer to voter residences; and it helps to ensure that each voter receives a ballot that lists only the candidates and public questions on which he or she can vote. Precinct-based voting has a long pedigree in the United States, and the policy of not counting out-of-precinct ballots is widespread.

The Court of Appeals discounted the State's interests because it found no evidence that a less restrictive alternative would threaten the integrity of precinct-based voting. But §2 does not require a State to show that its chosen policy is absolutely necessary or that a less restrictive means would not adequately serve the State's objectives. Considering the modest burdens allegedly imposed by Arizona's out-of-precinct policy, the small size of its disparate impact, and the State's justifications, the rule does not violate §2. Pp. 25–30.

(2) Arizona's HB 2023 also passes muster under §2. Arizonans can submit early ballots by going to a mailbox, a post office, an early ballot drop box, or an authorized election official's office. These options entail the "usual burdens of voting," and assistance from a statutorily authorized proxy is also available. The State also makes special provision for certain groups of voters who are unable to use the early voting system. See §16–549(C). And here, the plaintiffs were unable to show the extent to which HB 2023 disproportionately burdens minority voters.

Even if the plaintiffs were able to demonstrate a disparate burden caused by HB 2023, the State's "compelling interest in preserving the integrity of its election procedures" would suffice to avoid §2 liability. *Purcell* v. *Gonzalez*, 549 U. S. 1, 4. The Court of Appeals viewed the State's justifications for HB 2023 as tenuous largely because there was no evidence of early ballot fraud in Arizona. But prevention of fraud

is not the only legitimate interest served by restrictions on ballot collection. Third-party ballot collection can lead to pressure and intimidation. Further, a State may take action to prevent election fraud without waiting for it to occur within its own borders. Pp. 30–34.

(d) HB 2023 was not enacted with a discriminatory purpose, as the District Court found. Appellate review of that conclusion is for clear error. *Pullman-Standard* v. *Swint*, 456 U. S. 273, 287–288. The District Court's finding on the question of discriminatory intent had ample support in the record. The court considered the historical background and the highly politicized sequence of events leading to HB 2023's enactment; it looked for any departures from the normal legislative process; it considered relevant legislative history; and it weighed the law's impact on different racial groups. See *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 266–268. The court found HB 2023 to be the product of sincere legislative debate over the wisdom of early mail-in voting and the potential for fraud. And it took care to distinguish between racial motives and partisan motives. The District Court's interpretation of the evidence was plausible based on the record, so its permissible view is not clearly erroneous. See *Anderson* v. *Bessemer City*, 470 U. S. 564, 573–574. The Court of Appeals concluded that the District Court committed clear error by failing to apply a "cat's paw" theory—which analyzes whether an actor was a "dupe" who was "used by another to accomplish his purposes." That theory has its origin in employment discrimination cases and has no application to legislative bodies. Pp. 34–37.

948 F. 3d 989, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. GORSUCH, J., filed a concurring opinion, in which THOMAS, J., joined. KAGAN, J., filed a dissenting opinion, in which BREYER and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

Nos. 19–1257 and 19–1258

———

MARK BRNOVICH, ATTORNEY GENERAL OF
ARIZONA, ET AL., PETITIONERS
19–1257              *v.*
DEMOCRATIC NATIONAL COMMITTEE, ET AL.

ARIZONA REPUBLICAN PARTY, ET AL.,
PETITIONERS
19–1258              *v.*
DEMOCRATIC NATIONAL COMMITTEE, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[July 1, 2021]

JUSTICE ALITO delivered the opinion of the Court.

In these cases, we are called upon for the first time to apply §2 of the Voting Rights Act of 1965 to regulations that govern how ballots are collected and counted. Arizona law generally makes it very easy to vote. All voters may vote by mail or in person for nearly a month before election day, but Arizona imposes two restrictions that are claimed to be unlawful. First, in some counties, voters who choose to cast a ballot in person on election day must vote in their own precincts or else their ballots will not be counted. Second, mail-in ballots cannot be collected by anyone other than an election official, a mail carrier, or a voter's family member, household member, or caregiver. After a trial, a District Court upheld these rules, as did a panel of the United

States Court of Appeals for the Ninth Circuit. But an en banc court, by a divided vote, found them to be unlawful. It relied on the rules' small disparate impacts on members of minority groups, as well as past discrimination dating back to the State's territorial days. And it overturned the District Court's finding that the Arizona Legislature did not adopt the ballot-collection restriction for a discriminatory purpose. We now hold that the en banc court misunderstood and misapplied §2 and that it exceeded its authority in rejecting the District Court's factual finding on the issue of legislative intent.

## I
## A

Congress enacted the landmark Voting Rights Act of 1965, 79 Stat. 437, as amended, 52 U. S. C. §10301 *et seq.*, in an effort to achieve at long last what the Fifteenth Amendment had sought to bring about 95 years earlier: an end to the denial of the right to vote based on race. Ratified in 1870, the Fifteenth Amendment provides in §1 that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." Section 2 of the Amendment then grants Congress the "power to enforce [the Amendment] by appropriate legislation."

Despite the ratification of the Fifteenth Amendment, the right of African-Americans to vote was heavily suppressed for nearly a century. States employed a variety of notorious methods, including poll taxes, literacy tests, property qualifications, "'white primar[ies],'" and "'grandfather clause[s].'"[1] Challenges to some blatant efforts reached this Court and were held to violate the Fifteenth Amendment.

_____

[1] H. R. Rep. No. 439, 89th Cong., 1st Sess., 8, 11–13 (1965); S. Rep. No. 162, 89th Cong., 1st Sess., pt. 3, pp. 4–5 (1965); see *South Carolina* v. *Katzenbach*, 383 U. S. 301, 309–315 (1966).

See, *e.g.*, *Guinn* v. *United States*, 238 U. S. 347, 360–365 (1915) (grandfather clause); *Myers* v. *Anderson*, 238 U. S. 368, 379–380 (1915) (same); *Lane* v. *Wilson*, 307 U. S. 268, 275–277 (1939) (registration scheme predicated on grandfather clause); *Smith* v. *Allwright*, 321 U. S. 649, 659–666 (1944) (white primaries); *Schnell* v. *Davis*, 336 U. S. 933 (1949) (*per curiam*), affirming 81 F. Supp. 872 (SD Ala. 1949) (test of constitutional knowledge); *Gomillion* v. *Lightfoot*, 364 U. S. 339, 347 (1960) (racial gerrymander). But as late as the mid-1960s, black registration and voting rates in some States were appallingly low. See *South Carolina* v. *Katzenbach*, 383 U. S. 301, 313 (1966).

Invoking the power conferred by §2 of the Fifteenth Amendment, see 383 U. S., at 308; *City of Rome* v. *United States*, 446 U. S. 156, 173 (1980), Congress enacted the Voting Rights Act (VRA) to address this entrenched problem. The Act and its amendments in the 1970s specifically forbade some of the practices that had been used to suppress black voting. See §§4(a), (c), 79 Stat. 438–439; §6, 84 Stat. 315; §102, 89 Stat. 400, as amended, 52 U. S. C. §§10303(a), (c), 10501 (prohibiting the denial of the right to vote in any election for failure to pass a test demonstrating literacy, educational achievement or knowledge of any particular subject, or good moral character); see also §10, 79 Stat. 442, as amended, 52 U. S. C. §10306 (declaring poll taxes unlawful); §11, 79 Stat. 443, as amended, 52 U. S. C. §10307 (prohibiting intimidation and the refusal to allow or count votes). Sections 4 and 5 of the VRA imposed special requirements for States and subdivisions where violations of the right to vote had been severe. And §2 addressed the denial or abridgment of the right to vote in any part of the country.

As originally enacted, §2 closely tracked the language of the Amendment it was adopted to enforce. Section 2 stated simply that "[n]o voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or

abridge the right of any citizen of the United States to vote on account of race or color." 79 Stat. 437.

Unlike other provisions of the VRA, §2 attracted relatively little attention during the congressional debates[2] and was "little-used" for more than a decade after its passage.[3] But during the same period, this Court considered several cases involving "vote-dilution" claims asserted under the Equal Protection Clause of the Fourteenth Amendment. See *Whitcomb* v. *Chavis*, 403 U. S. 124 (1971); *Burns* v. *Richardson*, 384 U. S. 73 (1966); *Fortson* v. *Dorsey*, 379 U. S. 433 (1965). In these and later vote-dilution cases, plaintiffs claimed that features of legislative districting plans, including the configuration of legislative districts and the use of multi-member districts, diluted the ability of particular voters to affect the outcome of elections.

One Fourteenth Amendment vote-dilution case, *White* v. *Regester*, 412 U. S. 755 (1973), came to have outsized importance in the development of our VRA case law. In *White*, the Court affirmed a District Court's judgment that two multi-member electoral districts were "being used invidiously to cancel out or minimize the voting strength of racial groups." *Id.*, at 765. The Court explained what a vote-dilution plaintiff must prove, and the words the Court chose would later assume great importance in VRA §2 matters. According to *White*, a vote-dilution plaintiff had to show that "the political processes leading to nomination and election were not *equally open* to participation by the group in question—that its members had *less opportunity* than did other residents in the district to participate in the political processes and to elect legislators of their choice." *Id.*, at 766 (emphasis added). The decision then recited many pieces of evidence the District Court had taken into account, and it

_____

[2] See *Mobile* v. *Bolden*, 446 U. S. 55, 60–61 (1980) (plurality opinion) (describing §2's "sparse" legislative history).

[3] Boyd & Markman, The 1982 Amendments to the Voting Rights Act: A Legislative History, 40 Wash. & Lee L. Rev. 1347, 1352–1353 (1983).

found that this evidence sufficed to prove the plaintiffs' claim. See *id.*, at 766–769. The decision in *White* predated *Washington* v. *Davis*, 426 U. S. 229 (1976), where the Court held that an equal-protection challenge to a facially neutral rule requires proof of discriminatory purpose or intent, *id.*, at 238–245, and the *White* opinion said nothing one way or the other about purpose or intent.

A few years later, the question whether a VRA §2 claim required discriminatory purpose or intent came before this Court in *Mobile* v. *Bolden*, 446 U. S. 55 (1980). The plurality opinion for four Justices concluded first that §2 of the VRA added nothing to the protections afforded by the Fifteenth Amendment. *Id.*, at 60–61. The plurality then observed that prior decisions "ha[d] made clear that action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose." *Id.*, at 62. The obvious result of those premises was that facially neutral voting practices violate §2 only if motivated by a discriminatory purpose. The plurality read *White* as consistent with this requirement. *Bolden*, 446 U. S., at 68–70.

Shortly after *Bolden* was handed down, Congress amended §2 of the VRA. The oft-cited Report of the Senate Judiciary Committee accompanying the 1982 Amendment stated that the amendment's purpose was to repudiate *Bolden* and establish a new vote-dilution test based on what the Court had said in *White*. See S. Rep. No. 97–417, pp. 2, 15–16, 27. The bill that was initially passed by the House of Representatives included what is now §2(a). In place of the phrase "to deny or abridge the right . . . to vote on account of race or color," the amendment substituted "in a manner which *results in* a denial or abridgement of the right . . . to vote on account of race or color." H. R. Rep. No. 97–227, p. 48 (1981) (emphasis added); H. R. 3112, 97th Cong., 1st Sess., §2, p. 8 (introduced Oct. 7, 1981).

The House bill "originally passed . . . under a loose understanding that §2 would prohibit all discriminatory 'effects' of voting practices, and that intent would be 'irrelevant,'" but "[t]his version met stiff resistance in the Senate." *Mississippi Republican Executive Committee* v. *Brooks*, 469 U. S. 1002, 1010 (1984) (Rehnquist, J., dissenting) (quoting H. R. Rep. No. 97–227, at 29). The House and Senate compromised, and the final product included language proposed by Senator Dole. 469 U. S., at 1010–1011; S. Rep. No. 97–417, at 3–4; 128 Cong. Rec. 14131–14133 (1982) (Sen. Dole describing his amendment).

What is now §2(b) was added, and that provision sets out what must be shown to prove a §2 violation. It requires consideration of "the totality of circumstances" in each case and demands proof that "the political processes leading to nomination or election in the State or political subdivision are not *equally open* to participation" by members of a protected class "*in that its members have less opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U. S. C. §10301(b) (emphasis added). Reflecting the Senate Judiciary Committee's stated focus on the issue of vote dilution, this language was taken almost verbatim from *White*.

This concentration on the contentious issue of vote dilution reflected the results of the Senate Judiciary Committee's extensive survey of what it regarded as Fifteenth Amendment violations that called out for legislative redress. See, *e.g.*, S. Rep. No. 97–417, at 6, 8, 23–24, 27, 29. That survey listed many examples of what the Committee took to be unconstitutional vote dilution, but the survey identified only three isolated episodes involving the outright denial of the right to vote, and none of these concerned the equal application of a facially neutral rule specifying the time, place, or manner of voting. See *id.*, at 30, and

n. 119.[4]  These sparse results were presumably good news. They likely showed that the VRA and other efforts had achieved a large measure of success in combating the previously widespread practice of using such rules to hinder minority groups from voting.

This Court first construed the amended §2 in *Thornburg* v. *Gingles*, 478 U. S. 30 (1986)—another vote-dilution case. Justice Brennan's opinion for the Court set out three threshold requirements for proving a §2 vote-dilution claim, and, taking its cue from the Senate Report, provided a non-exhaustive list of factors to be considered in determining whether §2 had been violated. *Id.*, at 44–45, 48–51, 80. "The essence of a §2 claim," the Court said, "is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities" of minority and non-minority voters to elect their preferred representatives. *Id.*, at 47.

In the years since *Gingles*, we have heard a steady stream of §2 vote-dilution cases,[5] but until today, we have not considered how §2 applies to generally applicable time, place, or manner voting rules.  In recent years, however, such claims have proliferated in the lower courts.[6]

———————

[4] See *Brown* v. *Post*, 279 F. Supp. 60, 63 (WD La. 1968) (parish clerks discriminated with respect to absentee voting); *United States* v. *Post*, 297 F. Supp. 46, 51 (WD La. 1969) (election official induced blacks to vote in accordance with outdated procedures and made votes ineffective); *Toney* v. *White*, 488 F. 2d 310, 312 (CA5 1973) (registrar discriminated in purging voting rolls).

[5] See *Chisom* v. *Roemer*, 501 U. S. 380 (1991) (multi-member district); *Houston Lawyers' Assn.* v. *Attorney General of Tex.*, 501 U. S. 419 (1991) (at-large elections); *Voinovich* v. *Quilter*, 507 U. S. 146 (1993) (districting); *Growe* v. *Emison*, 507 U. S. 25 (1993) (same); *Holder* v. *Hall*, 512 U. S. 874 (1994) (single-member commission); *Johnson* v. *De Grandy*, 512 U. S. 997 (1994) (districting); *Abrams* v. *Johnson*, 521 U. S. 74 (1997) (same); *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399 (2006) (same); *Abbott* v. *Perez*, 585 U. S. \_\_\_ (2018) (same).

[6] See Brief for Sen. Ted Cruz et al. as *Amici Curiae* 22–24 (describing §2 challenges to laws regulating absentee voting, precinct voting, early

## B

The present dispute concerns two features of Arizona voting law, which generally makes it quite easy for residents to vote. All Arizonans may vote by mail for 27 days before an election using an "early ballot." Ariz. Rev. Stat. Ann. §§16–541 (2015), 16–542(C) (Cum. Supp. 2020). No special excuse is needed, §§16–541(A), 16–542(A), and any voter may ask to be sent an early ballot automatically in future elections, §16–544(A) (2015). In addition, during the 27 days before an election, Arizonans may vote in person at an early voting location in each county. See §§16–542(A), (E). And they may also vote in person on election day.

Each county is free to conduct election-day voting either by using the traditional precinct model or by setting up "voting centers." §16–411(B)(4) (Cum. Supp. 2020). Voting centers are equipped to provide all voters in a county with the appropriate ballot for the precinct in which they are registered, and this allows voters in the county to use whichever vote center they prefer. See *ibid.*

The regulations at issue in this suit govern precinct-based election-day voting and early mail-in voting. Voters who choose to vote in person on election day in a county that uses the precinct system must vote in their assigned precincts. See §16–122 (2015); see also §16–135. If a voter goes to the wrong polling place, poll workers are trained to direct the voter to the right location. *Democratic Nat. Comm.* v. *Reagan*, 329 F. Supp. 3d 824, 859 (Ariz. 2018); see Tr. 1559, 1586 (Oct. 12, 2017); Tr. Exh. 370 (Pima County Elections Inspectors Handbook). If a voter finds that his or her name does not appear on the register at what the voter believes

---

voting periods, voter identification (ID), election observer zones, same-day registration, durational residency, and straight-ticket voting); Brief for State of Ohio et al. as *Amici Curiae* 23–25 (describing various §2 challenges); Brief for Liberty Justice Center as *Amicus Curiae* 1–3, 7–11 (describing long-running §2 challenges to Wisconsin voter ID law).

is the right precinct, the voter ordinarily may cast a provisional ballot. Ariz. Rev. Stat. Ann. §16–584 (Cum. Supp. 2020). That ballot is later counted if the voter's address is determined to be within the precinct. See *ibid.* But if it turns out that the voter cast a ballot at the wrong precinct, that vote is not counted. See §16–584(E); App. 37–41 (election procedures manual); Ariz. Rev. Stat. Ann. §16–452(C) (misdemeanor to violate rules in election procedures manual).

For those who choose to vote early by mail, Arizona has long required that "[o]nly the elector may be in possession of that elector's unvoted early ballot." §16–542(D). In 2016, the state legislature enacted House Bill 2023 (HB 2023), which makes it a crime for any person other than a postal worker, an elections official, or a voter's caregiver, family member, or household member to knowingly collect an early ballot—either before or after it has been completed. §§16–1005(H)–(I).

In 2016, the Democratic National Committee and certain affiliates brought this suit and named as defendants (among others) the Arizona attorney general and secretary of state in their official capacities. Among other things, the plaintiffs claimed that both the State's refusal to count ballots cast in the wrong precinct and its ballot-collection restriction "adversely and disparately affect Arizona's American Indian, Hispanic, and African American citizens," in violation of §2 of the VRA. *Democratic Nat. Comm.* v. *Hobbs*, 948 F. 3d 989, 998 (CA9 2020) (en banc). In addition, they alleged that the ballot-collection restriction was "enacted with discriminatory intent" and thus violated both §2 of the VRA and the Fifteenth Amendment. *Ibid.*

After a 10-day bench trial, 329 F. Supp. 3d, at 832, 833–838, the District Court made extensive findings of fact and rejected all the plaintiffs' claims, *id.*, at 838–883. The court first found that the out-of-precinct policy "has no meaning-

fully disparate impact on the opportunities of minority voters to elect" representatives of their choice. *Id.*, at 872. The percentage of ballots invalidated under this policy was very small (0.15% of all ballots cast in 2016) and decreasing, and while the percentages were slightly higher for members of minority groups, the court found that this disparity "does not result in minorities having unequal access to the political process." *Ibid.* The court also found that the plaintiffs had not proved that the policy "causes minorities to show up to vote at the wrong precinct at rates higher than their non-minority counterparts," *id.*, at 873, and the court noted that the plaintiffs had not even challenged "the manner in which Arizona counties allocate and assign polling places or Arizona's requirement that voters re-register to vote when they move," *ibid.*

The District Court similarly found that the ballotcollection restriction is unlikely to "cause a meaningful inequality in the electoral opportunities of minorities." *Id.*, at 871. Rather, the court noted, the restriction applies equally to all voters and "does not impose burdens beyond those traditionally associated with voting." *Ibid.* The court observed that the plaintiffs had presented no records showing how many voters had previously relied on now-prohibited thirdparty ballot collectors and that the plaintiffs also had "provided no quantitative or statistical evidence" of the percentage of minority and non-minority voters in this group. *Id.*, at 866. "[T]he vast majority" of early voters, the court found, "do not return their ballots with the assistance of a [now-prohibited] third-party collector," *id.*, at 845, and the evidence largely showed that those who had used such collectors in the past "ha[d] done so out of convenience or personal preference, or because of circumstances that Arizona law adequately accommodates in other ways," *id.*, at 847.[7]

─────────

[7] An ill or disabled voter may have a ballot delivered by a special election board, and curbside voting at polling places is also allowed.  329

In addition, the court noted, none of the individual voters called by the plaintiffs had even claimed that the ballot-collection restriction "would make it significantly more difficult to vote." *Id.*, at 871.

Finally, the court found that the ballot-collection law had not been enacted with discriminatory intent. "[T]he majority of H.B. 2023's proponents," the court found, "were sincere in their belief that ballot collection increased the risk of early voting fraud, and that H.B. 2023 was a necessary prophylactic measure to bring early mail ballot security in line with in-person voting." *Id.*, at 879. The court added that "some individual legislators and proponents were motivated in part by partisan interests." *Id.,* at 882. But it distinguished between partisan and racial motives, while recognizing that "racially polarized voting can sometimes blur the lines." *Ibid.*

A divided panel of the Ninth Circuit affirmed, but an en banc court reversed. The en banc court first concluded that both the out-of-precinct policy and the ballot-collection restriction imposed disparate burdens on minority voters because such voters were more likely to be adversely affected by those rules. 948 F. 3d, at 1014–1016, 1032–1033. Then, based on an assessment of the vote-dilution factors used in *Gingles*, the en banc majority found that these disparate burdens were "in part caused by or linked to 'social and historical conditions'" that produce inequality. 948 F. 3d, at 1032 (quoting *Gingles*, 478 U. S., at 47); see 948 F. 3d, at 1037. Among other things, the court relied on racial discrimination dating back to Arizona's territorial days, current socioeconomic disparities, racially polarized voting, and racial campaign appeals. See *id.*, at 1016–1032, 1033–1037.

The en banc majority also held that the District Court had committed clear error in finding that the ballot-collection

––––––––––
F. Supp. 3d, at 848.

law was not enacted with discriminatory intent. The en banc court did not claim that a majority of legislators had voted for the law for a discriminatory purpose, but the court held that these lawmakers "were used as 'cat's paws'" by others. *Id.*, at 1041.

One judge in the majority declined to join the court's holding on discriminatory intent, and four others dissented across the board. A petition for a writ of certiorari was filed by the Arizona attorney general on his own behalf and on behalf of the State, which had intervened below; another petition was filed by the Arizona Republican Party and other private parties who also had intervened. We granted the petitions and agreed to review both the Ninth Circuit's understanding and application of VRA §2 and its holding on discriminatory intent. 591 U. S. ___ (2020).

## II

We begin with two preliminary matters. Secretary of State Hobbs contends that no petitioner has Article III standing to appeal the decision below as to the out-of-precinct policy, but we reject that argument. All that is needed to entertain an appeal of that issue is one party with standing, see *Little Sisters of the Poor Saints Peter and Paul Home* v. *Pennsylvania*, 591 U. S. ___, ___, n. 6 (2020) (slip op., at 13, n. 6), and we are satisfied that Attorney General Brnovich fits the bill. The State of Arizona intervened below, see App. 834; there is "[n]o doubt" as an Article III matter that "the State itself c[an] press this appeal," *Virginia House of Delegates* v. *Bethune-Hill*, 587 U. S. ___, ___ (2019) (slip op., at 4); and the attorney general is authorized to represent the State in any action in federal court, Ariz. Rev. Stat. Ann. §41–193(A)(3) (2021); see *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 51, n. 4 (1997).

Second, we think it prudent to make clear at the beginning that we decline in these cases to announce a test to govern all VRA §2 claims involving rules, like those at issue

here, that specify the time, place, or manner for casting ballots. Each of the parties advocated a different test, as did many *amici* and the courts below. In a brief filed in December in support of petitioners, the Department of Justice proposed one such test but later disavowed the analysis in that brief.[8] The Department informed us, however, that it did not disagree with its prior conclusion that the two provisions of Arizona law at issue in these cases do not violate §2 of the Voting Rights Act.[9] All told, no fewer than 10 tests have been proposed. But as this is our first foray into the area, we think it sufficient for present purposes to identify certain guideposts that lead us to our decision in these cases.

## III
### A

We start with the text of VRA §2. It now provides:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

"(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate

_____

[8] Letter from E. Kneedler, Deputy Solicitor General, to S. Harris, Clerk of Court (Feb. 16, 2021).
[9] *Ibid.*

to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U. S. C. §10301.

In *Gingles*, our seminal §2 vote-dilution case, the Court quoted the text of amended §2 and then jumped right to the Senate Judiciary Committee Report, which focused on the issue of vote dilution. 478 U. S., at 36–37, 43, and n. 7. Our many subsequent vote-dilution cases have largely followed the path that *Gingles* charted. But because this is our first §2 time, place, or manner case, a fresh look at the statutory text is appropriate. Today, our statutory interpretation cases almost always start with a careful consideration of the text, and there is no reason to do otherwise here.

B

Section 2(a), as noted, omits the phrase "to deny or abridge the right . . . to vote on account of race or color," which the *Bolden* plurality had interpreted to require proof of discriminatory intent. In place of that language, §2(a) substitutes the phrase "in a manner which *results in* a denial or abridgement of the right . . . to vote on account of race or color." (Emphasis added.) We need not decide what this text would mean if it stood alone because §2(b), which was added to win Senate approval, explains what must be shown to establish a §2 violation. Section 2(b) states that §2 is violated only where "the political processes leading to nomination or election" are not "*equally open* to participation" by members of the relevant protected group "*in that its members have less opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice." (Emphasis added.)

The key requirement is that the political processes leading to nomination and election (here, the process of voting) must be "equally open" to minority and non-minority groups alike, and the most relevant definition of the term "open," as used in §2(b), is "without restrictions as to who may participate," Random House Dictionary of the English Language 1008 (J. Stein ed. 1966), or "requiring no special status, identification, or permit for entry or participation," Webster's Third New International Dictionary 1579 (1976).

What §2(b) means by voting that is not "equally open" is further explained by this language: "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." The phrase "in that" is "used to specify the respect in which a statement is true."[10] Thus, equal openness and equal opportunity are not separate requirements. Instead, equal opportunity helps to explain the meaning of equal openness. And the term "opportunity" means, among other things, "a combination of circumstances, time, and place suitable or favorable for a particular activity or action." *Id.*, at 1583; see also Random House Dictionary of the English Language, at 1010 ("an appropriate or favorable time or occasion," "a situation or condition favorable for attainment of a goal").

Putting these terms together, it appears that the core of §2(b) is the requirement that voting be "equally open." The statute's reference to equal "opportunity" may stretch that concept to some degree to include consideration of a person's ability to *use* the means that are equally open. But equal openness remains the touchstone.

—————

[10] The New Oxford American Dictionary 851 (2d ed. 2005); see 7 Oxford English Dictionary 763 (2d ed. 1989) ("in presence, view, or consequence of the fact that"); Webster's New International Dictionary 1253 (2d ed. 1934) ("Because; for the reason that").

## C

One other important feature of §2(b) stands out. The provision requires consideration of "the totality of circumstances." Thus, any circumstance that has a logical bearing on whether voting is "equally open" and affords equal "opportunity" may be considered. We will not attempt to compile an exhaustive list, but several important circumstances should be mentioned.

### 1

1. First, the size of the burden imposed by a challenged voting rule is highly relevant. The concepts of "open[ness]" and "opportunity" connote the absence of obstacles and burdens that block or seriously hinder voting, and therefore the size of the burden imposed by a voting rule is important. After all, every voting rule imposes a burden of some sort. Voting takes time and, for almost everyone, some travel, even if only to a nearby mailbox. Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules. But because voting necessarily requires some effort and compliance with some rules, the concept of a voting system that is "equally open" and that furnishes an equal "opportunity" to cast a ballot must tolerate the "usual burdens of voting." *Crawford* v. *Marion County Election Bd.*, 553 U. S. 181, 198 (2008) (opinion of Stevens, J.). Mere inconvenience cannot be enough to demonstrate a violation of §2.[11]

---

[11] There is a difference between openness and opportunity, on the one hand, and the absence of inconvenience, on the other. For example, suppose that an exhibit at a museum in a particular city is open to everyone free of charge every day of the week for several months. Some residents of the city who have the opportunity to view the exhibit may find it inconvenient to do so for many reasons—the problem of finding parking, dislike of public transportation, anticipation that the exhibit will be crowded, a plethora of weekend chores and obligations, etc. Or, to take another example, a college course may be open to all students and all

2. For similar reasons, the degree to which a voting rule departs from what was standard practice when §2 was amended in 1982 is a relevant consideration. Because every voting rule imposes a burden of some sort, it is useful to have benchmarks with which the burdens imposed by a challenged rule can be compared. The burdens associated with the rules in widespread use when §2 was adopted are therefore useful in gauging whether the burdens imposed by a challenged rule are sufficient to prevent voting from being equally "open" or furnishing an equal "opportunity" to vote in the sense meant by §2. Therefore, it is relevant that in 1982 States typically required nearly all voters to cast their ballots in person on election day and allowed only narrow and tightly defined categories of voters to cast absentee ballots. See, *e.g.*, 17 N. Y. Elec. Law Ann. §8–100 *et seq.* (West 1978), §8–300 *et seq.* (in-person voting), §8–400 *et seq.* (limited-excuse absentee voting); Pa. Stat. Ann., Tit. 25, §3045 *et seq.* (Purdon 1963) (in-person voting), §3149.1 *et seq.* (limited-excuse absentee voting); see §3146.1 (Purdon Cum. Supp. 1993) (same); Ohio Rev. Code Ann. §3501.02 *et seq.* (Lexis 1972) (in-person voting), §3509.01 *et seq.* (limited-excuse absentee voting); see §3509.02 (Lexis Supp. 1986) (same); Fla. Stat. Ann. §101.011 *et seq.* (1973) (in-person voting), §101.62 *et seq.* (limited-excuse absentee voting); see §97.063 (1982) (same); Ill. Rev. Stat., ch.46, §17–1 *et seq.* (West 1977) (in-person voting), §19–1 *et seq.* (limited-excuse absentee voting); D. C. Code §§1–1109, 1–1110 (1973) (in-person voting and limited-excuse absentee voting); see §1–1313 (1981) (same). As of January 1980, only three States permitted no-excuse absentee voting. See Gronke & Galanes-Rosenbaum, America Votes! 261, 267–269

_____

may have the opportunity to enroll, but some students may find it inconvenient to take the class for a variety of reasons. For example, classes may occur too early in the morning or on Friday afternoon; too much reading may be assigned; the professor may have a reputation as a hard grader; etc.

(B. Griffith ed. 2008); see also J. Sargent et al., Congressional Research Service, The Growth of Early and Nonprecinct Place Balloting, in Election Laws of the Fifty States and the District of Columbia (rev. 1976). We doubt that Congress intended to uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use in the United States. We have no need to decide whether adherence to, or a return to, a 1982 framework is necessarily lawful under §2, but the degree to which a challenged rule has a long pedigree or is in widespread use in the United States is a circumstance that must be taken into account.

3. The size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider. Small disparities are less likely than large ones to indicate that a system is not equally open. To the extent that minority and non-minority groups differ with respect to employment, wealth, and education, even neutral regulations, no matter how crafted, may well result in some predictable disparities in rates of voting and noncompliance with voting rules. But the mere fact there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote. The size of any disparity matters. And in assessing the size of any disparity, a meaningful comparison is essential. What are at bottom very small differences should not be artificially magnified. *E.g.*, *Frank* v. *Walker*, 768 F. 3d 744, 752, n. 3 (CA7 2014).

4. Next, courts must consider the opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision. This follows from §2(b)'s reference to the collective concept of a State's "political processes" and its "political process" as a whole. Thus, where a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the

other available means.

5. Finally, the strength of the state interests served by a challenged voting rule is also an important factor that must be taken into account. As noted, every voting rule imposes a burden of some sort, and therefore, in determining "based on the totality of circumstances" whether a rule goes too far, it is important to consider the reason for the rule. Rules that are supported by strong state interests are less likely to violate §2.

One strong and entirely legitimate state interest is the prevention of fraud. Fraud can affect the outcome of a close election, and fraudulent votes dilute the right of citizens to cast ballots that carry appropriate weight. Fraud can also undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome.

Ensuring that every vote is cast freely, without intimidation or undue influence, is also a valid and important state interest. This interest helped to spur the adoption of what soon became standard practice in this country and in other democratic nations the world round: the use of private voting booths. See *Burson* v. *Freeman*, 504 U. S. 191, 202–205 (1992) (plurality opinion).

2

While the factors set out above are important, others considered by some lower courts are less helpful in a case like the ones at hand. First, it is important to keep in mind that the *Gingles* or "Senate" factors grew out of and were designed for use in vote-dilution cases. Some of those factors are plainly inapplicable in a case involving a challenge to a facially neutral time, place, or manner voting rule. Factors three and four concern districting and election procedures

like "majority vote requirements," "anti-single shot provisions,"[12] and a "candidate slating process."[13]  See *Gingles*, 478 U. S., at 37 (internal quotation marks omitted).  Factors two, six, and seven (which concern racially polarized voting, racially tinged campaign appeals, and the election of minority-group candidates), *ibid.*, have a bearing on whether a districting plan affects the opportunity of minority voters to elect their candidates of choice.  But in cases involving neutral time, place, and manner rules, the only relevance of these and the remaining factors is to show that minority group members suffered discrimination in the past (factor one) and that effects of that discrimination persist (factor five).  *Id.,* at 36–37.  We do not suggest that these factors should be disregarded.  After all, §2(b) requires consideration of "the totality of circumstances."  But their relevance is much less direct.

We also do not find the disparate-impact model employed in Title VII and Fair Housing Act cases useful here.  The text of the relevant provisions of Title VII and the Fair Housing Act differ from that of VRA §2, and it is not obvious why Congress would conform rules regulating voting to

---

[12] Where voters are allowed to vote for multiple candidates in a race for multiple seats, single-shot voting is the practice of voting for only one candidate.  "'"Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates."'"  *Gingles*, 478 U. S., at 38–39, n. 5 (quoting *City of Rome* v. *United States*, 446 U. S. 156, 184, n. 19 (1980)); see also United States Commission on Civil Rights, The Voting Rights Act: Ten Years After 206–207 (1975).

[13] Slating has been described as "a process in which some influential non-governmental organization selects and endorses a group or 'slate' of candidates, rendering the election little more than a stamp of approval for the candidates selected."  *Westwego Citizens for Better Govt.* v. *Westwego*, 946 F. 2d 1109, 1116, n. 5 (CA5 1991).  Exclusion from such a system can make it difficult for minority groups to elect their preferred candidates.  See, *e.g.*, *White* v. *Regester*, 412 U. S. 755, 766–767, and n. 11 (1973) (describing one example).

those regulating employment and housing. For example, we think it inappropriate to read §2 to impose a strict "necessity requirement" that would force States to demonstrate that their legitimate interests can be accomplished only by means of the voting regulations in question. Stephanopoulos, Disparate Impact, Unified Law, 128 Yale L. J. 1566, 1617–1619 (2019) (advocating such a requirement). Demanding such a tight fit would have the effect of invalidating a great many neutral voting regulations with long pedigrees that are reasonable means of pursuing legitimate interests. It would also transfer much of the authority to regulate election procedures from the States to the federal courts. For those reasons, the Title VII and Fair Housing Act models are unhelpful in §2 cases.

D

The interpretation set out above follows directly from what §2 commands: consideration of "the totality of circumstances" that have a bearing on whether a State makes voting "equally open" to all and gives everyone an equal "opportunity" to vote. The dissent, by contrast, would rewrite the text of §2 and make it turn almost entirely on just one circumstance—disparate impact.

That is a radical project, and the dissent strains mightily to obscure its objective. To that end, it spends 20 pages discussing matters that have little bearing on the questions before us. The dissent provides historical background that all Americans should remember, see *post*, at 3–7 (opinion of KAGAN, J.), but that background does not tell us how to decide these cases. The dissent quarrels with the decision in *Shelby County* v. *Holder*, 570 U. S. 529 (2013), see *post*, at 7–9, which concerned §§4 and 5 of the VRA, not §2. It discusses all sorts of voting rules that are not at issue here. See *post*, at 9–12. And it dwells on points of law that nobody disputes: that §2 applies to a broad range of voting rules, practices, and procedures; that an "abridgement" of the

right to vote under §2 does not require outright denial of the right; that §2 does not demand proof of discriminatory purpose; and that a "facially neutral" law or practice may violate that provision. See *post,* at 12–20.

Only after this extended effort at misdirection is the dissent's aim finally unveiled: to undo as much as possible the compromise that was reached between the House and Senate when §2 was amended in 1982. Recall that the version originally passed by the House did not contain §2(b) and was thought to prohibit any voting practice that had "discriminatory effects," loosely defined. See *supra*, at 5–6. That is the freewheeling disparate-impact regime the dissent wants to impose on the States. But the version enacted into law includes §2(b), and that subsection directs us to consider "the totality of circumstances," not, as the dissent would have it, the totality of just one circumstance.[14] There is nothing to the dissent's charge that we are departing from the statutory text by identifying some of those considerations.

We have listed five relevant circumstances and have explained why they all stem from the statutory text and have a bearing on the determination that §2 requires. The dissent does not mention a single additional consideration, and

———————

[14] The dissent erroneously claims that the Senate-House compromise was only about proportional representation and not about "the equal-access right" at issue in the present cases. *Post*, at 19, n. 6. The text of the bill initially passed by the House had no equal-access right. See H. R. Rep. No. 97–227, p. 48 (1981); H. R. 3112, 97th Cong., 1st Sess., §2, p. 8 (introduced Oct. 7, 1981). Section 2(b) was the Senate's creation, and that provision is what directed courts to look beyond mere "results" to whether a State's "political processes" are "equally open," considering "the totality of circumstances." See *Mississippi Republican Executive Committee* v. *Brooks*, 469 U. S. 1002, 1010 (1984) (Rehnquist, J., dissenting) ("The compromise bill retained the 'results' language but also incorporated language directly from this Court's opinion in *White* v. *Regester*"). And while the proviso on proportional representation may not apply as directly in this suit, it is still a signal that §2 imposes something other than a pure disparate-impact regime.

it does its best to push aside all but one of the circumstances we discuss. It entirely rejects three of them: the size of the burden imposed by a challenged rule, see *post*, at 22–23, the landscape of voting rules both in 1982 and in the present, *post,* at 24–25,[15] and the availability of other ways to vote, *post,* at 23–24. Unable to bring itself to completely reject consideration of the state interests that a challenged rule serves, the dissent tries to diminish the significance of this circumstance as much as possible. See *post,* at 26–29. According to the dissent, an interest served by a voting rule, no matter how compelling, cannot support the rule unless a State can prove to the satisfaction of the courts that this interest could not be served by any other means. *Post*, at 17–18, 26–29. Such a requirement has no footing in the text of §2 or our precedent construing it.[16]

——————

[15] The dissent objects to consideration of the 1982 landscape because even rules that were prevalent at that time are invalid under §2 if they, well, violate §2. *Post,* at 24. We of course agree with that tautology. But the question is what it *means* to provide equal opportunity, and given that every voting rule imposes some amount of burden, rules that were and are commonplace are useful comparators when considering the totality of circumstances. Unlike the dissent, Congress did not set its sights on every facially neutral time, place, or manner voting rule in existence. See, *e.g.,* S. Rep. No. 97–417, at 10, n. 22 (describing what the Senate Judiciary Committee viewed as "blatant direct impediments to voting").

[16] For support, the dissent offers a baseless reading of one of our vote-dilution decisions. In *Houston Lawyers' Assn.*, 501 U. S. 419, we considered a §2 challenge to an electoral scheme wherein all trial judges in a judicial district were elected on a district-wide basis. *Id.,* at 422. The State asserted that it had a strong interest in district-wide judicial elections on the theory that they make every individual judge at least partly accountable to minority voters in the jurisdiction. *Id.,* at 424, 426. That unique interest, the State contended, should have "automatically" exempted the electoral scheme from §2 scrutiny altogether. *Id.,* at 426. We disagreed, holding that the State's interest was instead "a legitimate factor to be considered by courts among the 'totality of circumstances' in determining whether a §2 violation has occurred." *Ibid.* To illustrate why an "automati[c]" exemption from §2's coverage was inappropriate,

That requirement also would have the potential to invalidate just about any voting rule a State adopts. Take the example of a State's interest in preventing voting fraud. Even if a State could point to a history of serious voting fraud within its own borders, the dissent would apparently strike down a rule designed to prevent fraud unless the State could demonstrate an inability to combat voting fraud in any other way, such as by hiring more investigators and prosecutors, prioritizing voting fraud investigations, and heightening criminal penalties. Nothing about equal openness and equal opportunity dictates such a high bar for States to pursue their legitimate interests.

With all other circumstances swept away, all that remains in the dissent's approach is the size of any disparity in a rule's impact on members of protected groups. As we

--------

the Court hypothesized a case involving an "uncouth" district shaped like the one in *Gomillion* v. *Lightfoot*, 364 U. S. 339, 340 (1960), for which an inquiry under §2 "would at least arguably be required." 501 U. S., at 427. The Court then wrote the language upon which the dissent seizes: "Placing elections for single-member offices entirely beyond the scope of coverage of §2 would preclude such an inquiry, even if the State's interest in maintaining the 'uncouth' electoral system was trivial or illusory and even if any resulting impairment of a minority group's voting strength could be remedied without significantly impairing the State's interest in electing judges on a district-wide basis." *Id.,* at 427–428.

That *reductio ad absurdum*, used to demonstrate only why an automatic exemption from §2 scrutiny was inappropriate, did not announce an "inquiry" at all—much less the least-burdensome-means requirement the dissent would have us smuggle in from materially different statutory regimes. *Post*, at 18, n. 5, 26. Perhaps that is why *no one*—not the parties, not the United States, not the 36 other *amici*, not the courts below, and certainly not this Court in subsequent decisions—has advanced the dissent's surprising reading of a single phrase in *Houston Lawyers Assn.* The dissent apparently thinks that in 1991 we silently abrogated the principle that the nature of a State's interest is but one of many factors to consider, see *Thornburg* v. *Gingles*, 478 U. S. 30, 44–45 (1986), and that our subsequent cases have erred by failing simply to ask whether a less burdensome measure would suffice. Who knew?

have noted, differences in employment, wealth, and education may make it virtually impossible for a State to devise rules that do not have some disparate impact.  But under the dissent's interpretation of §2, any "statistically significant" disparity—wherever *that* is in the statute—may be enough to take down even facially neutral voting rules with long pedigrees that reasonably pursue important state interests.  *Post*, at 15, n. 4, 19–20, 32–33.[17]

Section 2 of the Voting Rights Act provides vital protection against discriminatory voting rules, and no one suggests that discrimination in voting has been extirpated or that the threat has been eliminated.  But §2 does not deprive the States of their authority to establish non-discriminatory voting rules, and that is precisely what the dissent's radical interpretation would mean in practice.  The dissent is correct that the Voting Rights Act exemplifies our country's commitment to democracy, but there is nothing democratic about the dissent's attempt to bring about a wholesale transfer of the authority to set voting rules from the States to the federal courts.

_____

[17] We do not think §2 is so procrustean.  Statistical significance may provide "evidence that something besides random error is at work," Federal Judicial Center, Reference Manual on Scientific Evidence 252 (3d ed. 2011), but it does not necessarily determine causes, and as the dissent acknowledges, *post,* at 15, n. 4, it is not the be-all and end-all of disparate-impact analysis.  See Federal Judicial Center, Reference Manual, at 252 ("[S]ignificant differences . . . are not evidence that [what is at work] is legally or practically important.  Statisticians distinguish between statistical and practical significance to make the point.  When practical significance is lacking—when the size of a disparity is negligible—there is no reason to worry about statistical significance"); *ibid.*, n. 102 (citing authorities).  Moreover, whatever might be "standard" in other contexts, *post,* at 15, n. 4, we have explained that VRA §2's focus on equal "open[ness]" and equal "opportunity" does not impose a standard disparate-impact regime.

## IV

## A

In light of the principles set out above, neither Arizona's out-of-precinct rule nor its ballot-collection law violates §2 of the VRA. Arizona's out-of-precinct rule enforces the requirement that voters who choose to vote in person on election day must do so in their assigned precincts. Having to identify one's own polling place and then travel there to vote does not exceed the "usual burdens of voting." *Crawford*, 553 U. S., at 198 (opinion of Stevens, J.) (noting the same about making a trip to the department of motor vehicles). On the contrary, these tasks are quintessential examples of the usual burdens of voting.

Not only are these unremarkable burdens, but the District Court's uncontested findings show that the State made extensive efforts to reduce their impact on the number of valid votes ultimately cast. The State makes accurate precinct information available to all voters. When precincts or polling places are altered between elections, each registered voter is sent a notice showing the voter's new polling place. 329 F. Supp. 3d, at 859. Arizona law also mandates that election officials send a sample ballot to each household that includes a registered voter who has not opted to be placed on the permanent early voter list, Ariz. Rev. Stat. Ann. §16–510(C) (2015), and this mailing also identifies the voter's proper polling location, 329 F. Supp. 3d, at 859. In addition, the Arizona secretary of state's office sends voters pamphlets that include information (in both English and Spanish) about how to identify their assigned precinct. *Ibid.*

Polling place information is also made available by other means. The secretary of state's office operates websites that provide voter-specific polling place information and allow voters to make inquiries to the secretary's staff. *Ibid.* Arizona's two most populous counties, Maricopa and Pima,

provide online polling place locators with information available in English and Spanish. *Ibid.* Other groups offer similar online tools. *Ibid.* Voters may also identify their assigned polling place by calling the office of their respective county recorder. *Ibid.* And on election day, poll workers in at least some counties are trained to redirect voters who arrive at the wrong precinct. *Ibid*; see Tr. 1559, 1586; Tr. Exh. 370 (Pima County Elections Inspectors Handbook).

The burdens of identifying and traveling to one's assigned precinct are also modest when considering Arizona's "political processes" as a whole. The Court of Appeals noted that Arizona leads other States in the rate of votes rejected on the ground that they were cast in the wrong precinct, and the court attributed this to frequent changes in polling locations, confusing placement of polling places, and high levels of residential mobility. 948 F. 3d, at 1000–1004. But even if it is marginally harder for Arizona voters to find their assigned polling places, the State offers other easy ways to vote. Any voter can request an early ballot without excuse. Any voter can ask to be placed on the permanent early voter list so that an early ballot will be mailed automatically. Voters may drop off their early ballots at any polling place, even one to which they are not assigned. And for nearly a month before election day, any voter can vote in person at an early voting location in his or her county. The availability of those options likely explains why out-of-precinct votes on election day make up such a small and apparently diminishing portion of overall ballots cast— 0.47% of all ballots in the 2012 general election and just 0.15% in 2016. 329 F. Supp. 3d, at 872.

Next, the racial disparity in burdens allegedly caused by the out-of-precinct policy is small in absolute terms. The District Court accepted the plaintiffs' evidence that, of the Arizona counties that reported out-of-precinct ballots in the 2016 general election, a little over 1% of Hispanic voters, 1% of African-American voters, and 1% of Native American

voters who voted on election day cast an out-of-precinct ballot. *Ibid.* For non-minority voters, the rate was around 0.5%. *Ibid.* (citing Tr. Exh. 97, at 3, 20–21). A policy that appears to work for 98% or more of voters to whom it applies—minority and non-minority alike—is unlikely to render a system unequally open.

The Court of Appeals attempted to paint a different picture, but its use of statistics was highly misleading for reasons that were well explained by Judge Easterbrook in a §2 case involving voter IDs. As he put it, a distorted picture can be created by dividing one percentage by another. *Frank*, 768 F. 3d, at 752, n. 3. He gave this example: "If 99.9% of whites had photo IDs, and 99.7% of blacks did," it could be said that "'blacks are three times as likely as whites to lack qualifying ID' $(0.3 \div 0.1 = 3)$, but such a statement would mask the fact that the populations were effectively identical." *Ibid.*

That is exactly what the en banc Ninth Circuit did here. The District Court found that among the counties that reported out-of-precinct ballots in the 2016 general election, roughly 99% of Hispanic voters, 99% of African-American voters, and 99% of Native American voters who voted on election day cast their ballots in the right precinct, while roughly 99.5% of non-minority voters did so. 329 F. Supp. 3d, at 872. Based on these statistics, the en banc Ninth Circuit concluded that "minority voters in Arizona cast [out-of-precinct] ballots at twice the rate of white voters." 948 F. 3d, at 1014; see *id.*, at 1004–1005. This is precisely the sort of statistical manipulation that Judge Easterbrook rightly criticized, namely, $1.0 \div 0.5 = 2$. Properly understood, the statistics show only a small disparity that provides little support for concluding that Arizona's political processes are not equally open.

The Court of Appeals' decision also failed to give appropriate weight to the state interests that the out-of-precinct rule serves. Not counting out-of-precinct votes induces

compliance with the requirement that Arizonans who choose to vote in-person on election day do so at their assigned polling places. And as the District Court recognized, precinct-based voting furthers important state interests. It helps to distribute voters more evenly among polling places and thus reduces wait times. It can put polling places closer to voter residences than would a more centralized voting-center model. In addition, precinct-based voting helps to ensure that each voter receives a ballot that lists only the candidates and public questions on which he or she can vote, and this orderly administration tends to decrease voter confusion and increase voter confidence in elections. See 329 F. Supp. 3d, at 878. It is also significant that precinct-based voting has a long pedigree in the United States. See 948 F. 3d, at 1062–1063 (Bybee, J., dissenting) (citing J. Harris, Election Administration in the United States 206–207 (1934)). And the policy of not counting out-of-precinct ballots is widespread. See 948 F. 3d, at 1072–1088 (collecting and categorizing state laws).

The Court of Appeals discounted the State's interests because, in its view, there was no evidence that a less restrictive alternative would threaten the integrity of precinct-based voting. The court thought the State had no good reason for not counting an out-of-precinct voter's choices with respect to the candidates and issues also on the ballot in the voter's proper precinct. See *id*., at 1030–1031. We disagree with this reasoning.

Section 2 does not require a State to show that its chosen policy is absolutely necessary or that a less restrictive means would not adequately serve the State's objectives. And the Court of Appeals' preferred alternative would have obvious disadvantages. Partially counting out-of-precinct ballots would complicate the process of tabulation and could lead to disputes and delay. In addition, as one of the en banc dissenters noted, it would tend to encourage voters who are primarily interested in only national or state-wide

elections to vote in whichever place is most convenient even if they know that it is not their assigned polling place. See *id.*, at 1065–1066 (opinion of Bybee, J.).

In light of the modest burdens allegedly imposed by Arizona's out-of-precinct policy, the small size of its disparate impact, and the State's justifications, we conclude the rule does not violate §2 of the VRA.[18]

## B

HB 2023 likewise passes muster under the results test of §2. Arizonans who receive early ballots can submit them by going to a mailbox, a post office, an early ballot drop box, or an authorized election official's office within the 27-day early voting period. They can also drop off their ballots at any polling place or voting center on election day, and in order to do so, they can skip the line of voters waiting to vote in person. 329 F. Supp. 3d, at 839 (citing ECF Doc. 361, ¶57). Making any of these trips—much like traveling to an assigned polling place—falls squarely within the heartland of the "usual burdens of voting." *Crawford*, 553 U. S., at 198 (opinion of Stevens, J.). And voters can also ask a statutorily authorized proxy—a family member, a household member, or a caregiver—to mail a ballot or drop

––––––––

[18] In arguing that Arizona's out-of-precinct policy violates §2, the dissent focuses on the State's decisions about the siting of polling places and the frequency with which voting precincts are changed. See *post*, at 33 ("Much of the story has to do with the siting and shifting of polling places"). But the plaintiffs did not challenge those practices. See 329 F. Supp. 3d, at 873 ("Plaintiffs . . . do not challenge the manner in which Arizona counties allocate and assign polling places or Arizona's requirement that voters re-register to vote when they move"). The dissent is thus left with the unenviable task of explaining how something like a 0.5% disparity in discarded ballots between minority and non-minority groups suffices to render Arizona's political processes not equally open to participation. See *supra,* at 27–28. A voting rule with that effect would not be—to use the dissent's florid example—one that a "minority vote suppressor in Arizona" would want in his or her "bag of tricks." *Post*, at 33.

it off at any time within 27 days of an election.

Arizona also makes special provision for certain groups of voters who are unable to use the early voting system. Every county must establish a special election board to serve voters who are "confined as the result of a continuing illness or physical disability," are unable to go to the polls on election day, and do not wish to cast an early vote by mail. Ariz. Rev. Stat. Ann. §16–549(C) (Cum. Supp. 2020). At the request of a voter in this group, the board will deliver a ballot in person and return it on the voter's behalf. §§16–549(C), (E). Arizona law also requires employers to give employees time off to vote when they are otherwise scheduled to work certain shifts on election day. §16–402 (2015).

The plaintiffs were unable to provide statistical evidence showing that HB 2023 had a disparate impact on minority voters. Instead, they called witnesses who testified that third-party ballot collection tends to be used most heavily in disadvantaged communities and that minorities in Arizona—especially Native Americans—are disproportionately disadvantaged. 329 F. Supp. 3d, at 868, 870. But from that evidence the District Court could conclude only that prior to HB 2023's enactment, "minorities generically were more likely than non-minorities to return their early ballots with the assistance of third parties." *Id.*, at 870. How much more, the court could not say from the record. *Ibid.* Neither can we. And without more concrete evidence, we cannot conclude that HB 2023 results in less opportunity to participate in the political process.[19]

————————

[19] Not one to let the absence of a key finding get in the way, the dissent concludes from its own review of the evidence that HB 2023 "prevents many Native Americans from making effective use of one of the principal means of voting in Arizona," and that "[w]hat is an inconsequential burden for others is for these citizens a severe hardship." *Post*, at 38. What is missing from those statements is any evidence about the actual size of the disparity. (For that matter, by the time the dissent gets around to assessing HB 2023, it appears to have lost its zeal for statistical significance, which is nowhere to be seen. See *post*, at 35–40, and n. 13.) The

Even if the plaintiffs had shown a disparate burden caused by HB 2023, the State's justifications would suffice to avoid §2 liability. "A State indisputably has a compelling interest in preserving the integrity of its election process." *Purcell* v. *Gonzalez*, 549 U. S. 1, 4 (2006) (*per curiam*) (internal quotation marks omitted). Limiting the classes of persons who may handle early ballots to those less likely to have ulterior motives deters potential fraud and improves voter confidence. That was the view of the bipartisan Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James Baker. The Carter-Baker Commission noted that "[a]bsentee balloting is vulnerable to abuse in several ways: . . . Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation." Report of the Comm'n on Fed. Election Reform, Building Confidence in U. S. Elections 46 (Sept. 2005).

The Commission warned that "[v]ote buying schemes are

---

reader will search in vain to discover where the District Court "found" to what extent HB 2023 would make it "'significantly more difficult'" for Native Americans to vote. *Post,* at 39, n. 15 (citing 329 F. Supp. 3d, at 868, 870). Rather, "[b]ased on" the very same evidence the dissent cites, the District Court could find only that minorities were "generically" more likely than non-minorities to make use of third-party ballot-collection. *Id.,* at 870. The District Court's explanation as to why speaks for itself:

"Although there are significant socioeconomic disparities between minorities and non-minorities in Arizona, these disparities are an imprecise proxy for disparities in ballot collection use. Plaintiffs do not argue that all or even most socioeconomically disadvantaged voters use ballot collection services, nor does the evidence support such a finding. Rather, the anecdotal estimates from individual ballot collectors indicate that a relatively small number of voters have used ballot collection services in past elections." *Ibid.*; see also *id.,* at 881 ("[B]allot collection was used as a [get-out-the-vote] strategy in mostly low-efficacy minority communities, though the Court cannot say how often voters used ballot collection, *nor can it measure the degree or significance of any disparities in its usage*" (emphasis added)).

far more difficult to detect when citizens vote by mail," and it recommended that "States therefore should reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots." *Ibid.* The Commission ultimately recommended that States limit the classes of persons who may handle absentee ballots to "the voter, an acknowledged family member, the U. S. Postal Service or other legitimate shipper, or election officials." *Id.*, at 47. HB 2023 is even more permissive in that it also authorizes ballot-handling by a voter's household member and caregiver. See Ariz. Rev. Stat. Ann. §16–1005(I)(2). Restrictions on ballot collection are also common in other States. See 948 F. 3d, at 1068–1069, 1088–1143 (Bybee, J., dissenting) (collecting state provisions).

The Court of Appeals thought that the State's justifications for HB 2023 were tenuous in large part because there was no evidence that fraud in connection with early ballots had occurred in Arizona. See *id.*, at 1045–1046. But prevention of fraud is not the only legitimate interest served by restrictions on ballot collection. As the Carter-Baker Commission recognized, third-party ballot collection can lead to pressure and intimidation. And it should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders. Section 2's command that the political processes remain equally open surely does not demand that "a State's political system sustain some level of damage before the legislature [can] take corrective action." *Munro* v. *Socialist Workers Party*, 479 U. S. 189, 195 (1986). Fraud is a real risk that accompanies mail-in voting even if Arizona had the good fortune to avoid it. Election fraud has had serious consequences in other States. For example, the North Carolina Board of Elections invalidated the results of a 2018 race for a seat in the House of Representatives for

evidence of fraudulent mail-in ballots.[20]  The Arizona Legislature was not obligated to wait for something similar to happen closer to home.[21]

As with the out-of-precinct policy, the modest evidence of racially disparate burdens caused by HB 2023, in light of the State's justifications, leads us to the conclusion that the law does not violate §2 of the VRA.

## V

We also granted certiorari to review whether the Court of Appeals erred in concluding that HB 2023 was enacted with a discriminatory purpose.  The District Court found that it

--------

[20] See Blinder, Election Fraud in North Carolina Leads to New Charges for Republican Operative, N. Y. Times, July 30, 2019, https://www.ny-times.com/2019/07/30/us/mccrae-dowless-indictment.html;    Graham, North Carolina Had No Choice, The Atlantic, Feb. 22, 2019, https://www.theatlantic.com/politics/archive/2019/02/north-carolina-9th-fraud-board-orders-new-election/583369/.

[21] The dissent's primary argument regarding HB 2023 concerns its effect on Native Americans who live on remote reservations.  The dissent notes that many of these voters do not receive mail delivery at home, that the nearest post office may be some distance from their homes, and that they may not have automobiles.  *Post,* at 36.  We do not dismiss these problems, but for a number of reasons, they do not provide a basis for invalidating HB 2023.  The burdens that fall on remote communities are mitigated by the long period of time prior to an election during which a vote may be cast either in person or by mail and by the legality of having a ballot picked up and mailed by family or household members.  And in this suit, no individual voter testified that HB 2023 would make it significantly more difficult for him or her to vote.  329 F. Supp. 3d, at 871.  Moreover, the Postal Service is required by law to "provide a maximum degree of effective and regular postal services to rural areas, communities, and small towns where post offices are not self-sustaining."  39 U. S. C. §101(b); see also §403(b)(3).  Small post offices may not be closed "solely for operating at a deficit," §101(b), and any decision to close or consolidate a post office may be appealed to the Postal Regulatory Commission, see §404(d)(5).  An alleged failure by the Postal Service to comply with its statutory obligations in a particular location does not in itself provide a ground for overturning a voting rule that applies throughout an entire State.

was not, 329 F. Supp. 3d, at 882, and appellate review of
that conclusion is for clear error, *Pullman-Standard* v.
*Swint*, 456 U. S. 273, 287–288 (1982). If the district court's
view of the evidence is plausible in light of the entire record,
an appellate court may not reverse even if it is convinced
that it would have weighed the evidence differently in the
first instance. *Anderson* v. *Bessemer City*, 470 U. S. 564,
573–574 (1985). "Where there are two permissible views of
the evidence, the factfinder's choice between them cannot
be clearly erroneous." *Id.*, at 574.

The District Court's finding on the question of discrimi-
natory intent had ample support in the record. Applying
the familiar approach outlined in *Arlington Heights* v. *Met-
ropolitan Housing Development Corp.*, 429 U. S. 252, 266–
268 (1977), the District Court considered the historical
background and the sequence of events leading to HB
2023's enactment; it looked for any departures from the nor-
mal legislative process; it considered relevant legislative
history; and it weighed the law's impact on different racial
groups. See 329 F. Supp. 3d, at 879.

The court noted, among other things, that HB 2023's en-
actment followed increased use of ballot collection as a
Democratic get-out-the-vote strategy and came "on the
heels of several prior efforts to restrict ballot collection,
some of which were spearheaded by former Arizona State
Senator Don Shooter." *Id.*, at 879. Shooter's own election
in 2010 had been close and racially polarized. Aiming in
part to frustrate the Democratic Party's get-out-the-vote
strategy, Shooter made what the court termed "unfounded
and often far-fetched allegations of ballot collection fraud."
*Id.*, at 880. But what came after the airing of Shooter's
claims and a "racially-tinged" video created by a private
party was a serious legislative debate on the wisdom of

early mail-in voting.  *Ibid.*[22]

That debate, the District Court concluded, was sincere and led to the passage of HB 2023 in 2016.  Proponents of the bill repeatedly argued that mail-in ballots are more susceptible to fraud than in-person voting.  *Ibid.*  The bill found support from a few minority officials and organizations, one of which expressed concern that ballot collectors were taking advantage of elderly Latino voters.  *Ibid.*  And while some opponents of the bill accused Republican legislators of harboring racially discriminatory motives, that view was not uniform.  See *ibid.*  One Democratic state senator pithily described the "'problem'" HB 2023 aimed to "'solv[e]'" as the fact that "'one party is better at collecting ballots than the other one.'"  *Id.*, at 882 (quoting Tr. Exh. 25, at 35).

We are more than satisfied that the District Court's interpretation of the evidence is permissible.  The spark for the debate over mail-in voting may well have been provided by one Senator's enflamed partisanship, but partisan motives are not the same as racial motives.  See *Cooper* v. *Harris*, 581 U. S. ___, ___–___ (2017) (slip op., at 19–20).  The District Court noted that the voting preferences of members of a racial group may make the former look like the latter, but it carefully distinguished between the two.  See 329 F. Supp. 3d, at 879, 882.  And while the District Court recognized that the "racially-tinged" video helped spur the debate about ballot collection, it found no evidence that the legislature as a whole was imbued with racial motives.  *Id.,* at 879–880.

_____

[22] The District Court also noted prior attempts on the part of the Arizona Legislature to regulate or limit third-party ballot collection in 2011 and 2013.  It reasonably concluded that any procedural irregularities in those attempts had less probative value for inferring the purpose behind HB 2023 because the bills were passed "during different legislative sessions by a substantially different composition of legislators."  329 F. Supp. 3d, at 881.

The Court of Appeals did not dispute the District Court's assessment of the sincerity of HB 2023's proponents. It even agreed that some members of the legislature had a "sincere, though mistaken, non-race-based belief that there had been fraud in third-party ballot collection, and that the problem needed to be addressed." 948 F. 3d, at 1040. The Court of Appeals nevertheless concluded that the District Court committed clear error by failing to apply a "'cat's paw'" theory sometimes used in employment discrimination cases. *Id.,* at 1040–1041. A "cat's paw" is a "dupe" who is "used by another to accomplish his purposes." Webster's New International Dictionary 425 (2d ed. 1934). A plaintiff in a "cat's paw" case typically seeks to hold the plaintiff's employer liable for "the animus of a supervisor who was not charged with making the ultimate [adverse] employment decision." *Staub* v. *Proctor Hospital*, 562 U. S. 411, 415 (2011).

The "cat's paw" theory has no application to legislative bodies. The theory rests on the agency relationship that exists between an employer and a supervisor, but the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents. Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents. It is insulting to suggest that they are mere dupes or tools.

*            *            *

Arizona's out-of-precinct policy and HB 2023 do not violate §2 of the VRA, and HB 2023 was not enacted with a racially discriminatory purpose. The judgment of the Court of Appeals is reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 19–1257 and 19–1258

_____

MARK BRNOVICH, ATTORNEY GENERAL OF
ARIZONA, ET AL., PETITIONERS
19–1257                 *v.*
DEMOCRATIC NATIONAL COMMITTEE, ET AL.


ARIZONA REPUBLICAN PARTY, ET AL.,
PETITIONERS
19–1258                 *v.*
DEMOCRATIC NATIONAL COMMITTEE, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[July 1, 2021]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, concurring.

I join the Court's opinion in full, but flag one thing it does not decide. Our cases have assumed—without deciding—that the Voting Rights Act of 1965 furnishes an implied cause of action under §2. See *Mobile* v. *Bolden*, 446 U. S. 55, 60, and n. 8 (1980) (plurality opinion). Lower courts have treated this as an open question. *E.g., Washington* v. *Finlay*, 664 F. 2d 913, 926 (CA4 1981). Because no party argues that the plaintiffs lack a cause of action here, and because the existence (or not) of a cause of action does not go to a court's subject-matter jurisdiction, see *Reyes Mata* v. *Lynch*, 576 U. S. 143, 150 (2015), this Court need not and does not address that issue today.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 19–1257 and 19–1258

_____

MARK BRNOVICH, ATTORNEY GENERAL OF
ARIZONA, ET AL., PETITIONERS
19–1257             _v._
DEMOCRATIC NATIONAL COMMITTEE, ET AL.


ARIZONA REPUBLICAN PARTY, ET AL.,
PETITIONERS
19–1258             _v._
DEMOCRATIC NATIONAL COMMITTEE, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[July 1, 2021]

JUSTICE KAGAN, with whom JUSTICE BREYER and
JUSTICE SOTOMAYOR join, dissenting.

If a single statute represents the best of America, it is the
Voting Rights Act. It marries two great ideals: democracy
and racial equality. And it dedicates our country to carry-
ing them out. Section 2, the provision at issue here, guar-
antees that members of every racial group will have equal
voting opportunities. Citizens of every race will have the
same shot to participate in the political process and to elect
representatives of their choice. They will all own our de-
mocracy together—no one more and no one less than any
other.

If a single statute reminds us of the worst of America, it
is the Voting Rights Act. Because it was—and remains—so
necessary. Because a century after the Civil War was
fought, at the time of the Act's passage, the promise of po-

litical equality remained a distant dream for African American citizens. Because States and localities continually "contriv[ed] new rules," mostly neutral on their face but discriminatory in operation, to keep minority voters from the polls. *South Carolina* v. *Katzenbach*, 383 U. S. 301, 335 (1966). Because "Congress had reason to suppose" that States would "try similar maneuvers in the future"— "pour[ing] old poison into new bottles" to suppress minority votes. *Ibid.*; *Reno* v. *Bossier Parish School Bd.*, 528 U. S. 320, 366 (2000) (Souter, J., concurring in part and dissenting in part). Because Congress has been proved right.

The Voting Rights Act is ambitious, in both goal and scope. When President Lyndon Johnson sent the bill to Congress, ten days after John Lewis led marchers across the Edmund Pettus Bridge, he explained that it was "carefully drafted to meet its objective—the end of discrimination in voting in America." H. R. Doc. No. 120, 89th Cong., 1st Sess., 1–2 (1965). He was right about how the Act's drafting reflected its aim. "The end of discrimination in voting" is a far-reaching goal. And the Voting Rights Act's text is just as far-reaching. A later amendment, adding the provision at issue here, became necessary when this Court construed the statute too narrowly. And in the last decade, this Court assailed the Act again, undoing its vital Section 5. See *Shelby County* v. *Holder*, 570 U. S. 529 (2013). But Section 2 of the Act remains, as written, as expansive as ever— demanding that every citizen of this country possess a right at once grand and obvious: the right to an equal opportunity to vote.

Today, the Court undermines Section 2 and the right it provides. The majority fears that the statute Congress wrote is too "radical"—that it will invalidate too many state voting laws. See *ante*, at 21, 25. So the majority writes its own set of rules, limiting Section 2 from multiple directions. See *ante*, at 16–19. Wherever it can, the majority gives a cramped reading to broad language. And then it uses that

reading to uphold two election laws from Arizona that discriminate against minority voters. I could say—and will in the following pages—that this is not how the Court is supposed to interpret and apply statutes. But that ordinary critique woefully undersells the problem. What is tragic here is that the Court has (yet again) rewritten—in order to weaken—a statute that stands as a monument to America's greatness, and protects against its basest impulses. What is tragic is that the Court has damaged a statute designed to bring about "the end of discrimination in voting." I respectfully dissent.

## I

The Voting Rights Act of 1965 is an extraordinary law. Rarely has a statute required so much sacrifice to ensure its passage. Never has a statute done more to advance the Nation's highest ideals. And few laws are more vital in the current moment. Yet in the last decade, this Court has treated no statute worse. To take the measure of today's harm, a look to the Act's past must come first. The idea is not to recount, as the majority hurriedly does, some bygone era of voting discrimination. See *ante*, at 2–3. It is instead to describe the electoral practices that the Act targets—and to show the high stakes of the present controversy.

## A

Democratic ideals in America got off to a glorious start; democratic practice not so much. The Declaration of Independence made an awe-inspiring promise: to institute a government "deriving [its] just powers from the consent of the governed." But for most of the Nation's first century, that pledge ran to white men only. The earliest state election laws excluded from the franchise African Americans, Native Americans, women, and those without property. See A. Keyssar, The Right To Vote: The Contested History of Democracy in the United States 8–21, 54–60 (2000). In

1855, on the precipice of the Civil War, only five States permitted African Americans to vote. *Id.*, at 55. And at the federal level, our Court's most deplorable holding made sure that no black people could enter the voting booth. See *Dred Scott* v. *Sandford*, 19 How. 393 (1857).

But the "American ideal of political equality . . . could not forever tolerate the limitation of the right to vote" to whites only. *Mobile* v. *Bolden*, 446 U. S. 55, 103–104 (1980) (Marshall, J., dissenting). And a civil war, dedicated to ensuring "government of the people, by the people, for the people," brought constitutional change. In 1870, after a hard-fought battle over ratification, the Fifteenth Amendment carried the Nation closer to its founding aspirations. "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." Those words promised to enfranchise millions of black citizens who only a decade earlier had been slaves. Frederick Douglass held that the Amendment "means that we are placed upon an equal footing with all other men"—that with the vote, "liberty is to be the right of all." 4 The Frederick Douglass Papers 270–271 (J. Blassingame & J. McKivigan eds. 1991). President Grant had seen much blood spilled in the Civil War; now he spoke of the fruits of that sacrifice. In a self-described "unusual" message to Congress, he heralded the Fifteenth Amendment as "a measure of grander importance than any other one act of the kind from the foundation of our free Government"—as "the most important event that has occurred since the nation came into life." Ulysses S. Grant, Message to the Senate and House of Representatives (Mar. 30, 1870), in 7 Compilation of the Messages and Papers of the Presidents 1789–1897, pp. 55–56 (J. Richardson ed. 1898).

Momentous as the Fifteenth Amendment was, celebration of its achievements soon proved premature. The Amendment's guarantees "quickly became dead letters in

much of the country." Foner, The Strange Career of the Reconstruction Amendments, 108 Yale L. J. 2003, 2007 (1999). African Americans daring to go to the polls often "met with coordinated intimidation and violence." *Northwest Austin Municipal Util. Dist. No. One* v. *Holder*, 557 U. S. 193, 218–219 (2009) (THOMAS, J., concurring in judgment in part and dissenting in part). And almost immediately, legislators discovered that bloodless actions could also suffice to limit the electorate to white citizens. Many States, especially in the South, suppressed the black vote through a dizzying array of methods: literacy tests, poll taxes, registration requirements, and property qualifications. See *Katzenbach*, 383 U. S., at 310–312. Most of those laws, though facially neutral, gave enough discretion to election officials to prevent significant effects on poor or uneducated whites. The idea, as one Virginia representative put it, was "to disfranchise every negro that [he] could disfranchise," and "as few white people as possible." Keyssar 113. Decade after decade after decade, election rules blocked African Americans—and in some States, Hispanics and Native Americans too—from making use of the ballot. See *Oregon* v. *Mitchell*, 400 U. S. 112, 132 (1970) (opinion of Black, J.) (discussing treatment of non-black groups). By 1965, only 27% of black Georgians, 19% of black Alabamians, and 7%—yes, 7%—of black Mississippians were registered to vote. See C. Bullock, R. Gaddie, & J. Wert, The Rise and Fall of the Voting Rights Act 23 (2016).

The civil rights movement, and the events of a single Bloody Sunday, created pressure for change. Selma was the heart of an Alabama county whose 15,000 black citizens included, in 1961, only 156 on the voting rolls. See D. Garrow, Protest at Selma 31 (1978). In the first days of 1965, the city became the epicenter of demonstrations meant to force Southern election officials to register African American voters. As weeks went by without results, organizers announced a march from Selma to Montgomery. On March 7,

some 600 protesters, led by future Congressman John Lewis, sought to cross the Edmund Pettus Bridge. State troopers in riot gear responded brutally: "Turning their nightsticks horizontally, they rushed into the crowd, knocking people over like bowling pins." G. May, Bending Toward Justice 87 (2013). Then came men on horseback, "swinging their clubs and ropes like cowboys driving cattle to market." *Ibid.* The protestors were beaten, knocked unconscious, and bloodied. Lewis's skull was fractured. "I thought I was going to die on this bridge," he later recalled. Rojas, Selma Helped Define John Lewis's Life, N. Y. Times, July 28, 2020.

A galvanized country responded. Ten days after the Selma march, President Johnson wrote to Congress proposing legislation to "help rid the Nation of racial discrimination in every aspect of the electoral process and thereby insure the right of all to vote." H. R. Doc. No. 120, at 1. (To his attorney general, Johnson was still more emphatic: "I want you to write the goddamnedest toughest voting rights act that you can devise." H. Raines, My Soul Is Rested 337 (1983).) And in August 1965, after the bill's supporters overcame a Senate filibuster, Johnson signed the Voting Rights Act into law. Echoing Grant's description of the Fifteenth Amendment, Johnson called the statute "one of the most monumental laws in the entire history of American freedom." Public Papers of the Presidents, Lyndon B. Johnson, Vol. 2, Aug. 6, 1965, p. 841 (1966) (Johnson Papers).

"After a century's failure to fulfill the promise" of the Fifteenth Amendment, "passage of the VRA finally led to signal improvement." *Shelby County*, 570 U. S., at 562 (Ginsburg, J., dissenting). In the five years after the statute's passage, almost as many African Americans registered to vote in six Southern States as in the entire century before 1965. See Davidson, The Voting Rights Act: A Brief History, in Controversies in Minority Voting 21 (B. Grofman &

C. Davidson eds. 1992). The crudest attempts to block voting access, like literacy tests and poll taxes, disappeared. Legislatures often replaced those vote denial schemes with new measures—mostly to do with districting—designed to dilute the impact of minority votes. But the Voting Rights Act, operating for decades at full strength, stopped many of those measures too. See, *e.g.*, *Chisom* v. *Roemer*, 501 U. S. 380 (1991); *Allen* v. *State Bd. of Elections*, 393 U. S. 544 (1969). As a famed dissent assessed the situation about a half-century after the statute's enactment: The Voting Rights Act had become "one of the most consequential, efficacious, and amply justified exercises of federal legislative power in our Nation's history." *Shelby County*, 570 U. S., at 562 (Ginsburg, J., dissenting).[1]

## B

Yet efforts to suppress the minority vote continue. No one would know this from reading the majority opinion. It hails the "good news" that legislative efforts had mostly shifted by the 1980s from vote denial to vote dilution. *Ante*, at 7. And then it moves on to other matters, as though the Voting Rights Act no longer has a problem to address—as though once literacy tests and poll taxes disappeared, so too did efforts to curb minority voting. But as this Court recognized about a decade ago, "racial discrimination and racially polarized voting are not ancient history." *Bartlett* v. *Strickland*, 556 U. S. 1, 25 (2009). Indeed, the problem of voting discrimination has become worse since that time— in part because of what this Court did in *Shelby County*.

---

[1] The majority brands this historical account part of an "extended effort at misdirection." *Ante*, at 22. I am tempted merely to reply: Enough said about the majority's outlook on the statute before us. But I will add what should be obvious—that no one can understand the Voting Rights Act without recognizing what led Congress to enact it, and what Congress wanted it to change.

Weaken the Voting Rights Act, and predictable consequences follow: yet a further generation of voter suppression laws.

Much of the Voting Rights Act's success lay in its capacity to meet ever-new forms of discrimination. Experience showed that "[w]henever one form of voting discrimination was identified and prohibited, others sprang up in its place." *Shelby County*, 570 U. S., at 560 (Ginsburg, J., dissenting). Combating those efforts was like "battling the Hydra"—or to use a less cultured reference, like playing a game of whack-a-mole. *Ibid.* So Congress, in Section 5 of the Act, gave the Department of Justice authority to review all new rules devised by jurisdictions with a history of voter suppression—and to block any that would have discriminatory effects. See 52 U. S. C. §§10304(a)–(b). In that way, the Act would prevent the use of new, more nuanced methods to restrict the voting opportunities of non-white citizens.

And for decades, Section 5 operated as intended. Between 1965 and 2006, the Department stopped almost 1200 voting laws in covered areas from taking effect. See *Shelby County*, 570 U. S., at 571 (Ginsburg, J., dissenting). Some of those laws used districting to dilute minority voting strength—making sure that the votes of minority citizens would carry less weight than the votes of whites in electing candidates. Other laws, even if facially neutral, disproportionately curbed the ability of non-white citizens to cast a ballot at all. So, for example, a jurisdiction might require forms of identification that those voters were less likely to have; or it might limit voting places and times convenient for those voters; or it might purge its voter rolls through mechanisms especially likely to ensnare them. See *id.*, at 574–575. In reviewing mountains of such evidence in 2006, Congress saw a continuing need for Section 5. Although "discrimination today is more subtle than the visible methods used in 1965," Congress found, it still produces "the

same [effects], namely a diminishing of the minority community's ability to fully participate in the electoral process." H. R. Rep. No. 109–478, p. 6 (2006). Congress thus reauthorized the preclearance scheme for 25 years.

But this Court took a different view. Finding that "[o]ur country has changed," the Court saw only limited instances of voting discrimination—and so no further need for preclearance. *Shelby County*, 570 U. S., at 547–549, 557. Displacing Congress's contrary judgment, the Court struck down the coverage formula essential to the statute's operation. The legal analysis offered was perplexing: The Court based its decision on a "principle of equal [state] sovereignty" that a prior decision of ours had rejected—and that has not made an appearance since. *Id.*, at 544 (majority opinion); see *id.*, at 587–588 (Ginsburg, J., dissenting). Worse yet was the Court's blithe confidence in assessing what was needed and what was not. "[T]hings have changed dramatically," the Court reiterated, *id.*, at 547: The statute that was once a necessity had become an imposition. But how did the majority know there was nothing more for Section 5 to do—that the (undoubted) changes in the country went so far as to make the provision unnecessary? It didn't, as Justice Ginsburg explained in dissent. The majority's faith that discrimination was almost gone derived, at least in part, from the success of Section 5—from its record of blocking discriminatory voting schemes. Discarding Section 5 because those schemes had diminished was "like throwing away your umbrella in a rainstorm because you are not getting wet." *Id.*, at 590.

The rashness of the act soon became evident. Once Section 5's strictures came off, States and localities put in place new restrictive voting laws, with foreseeably adverse effects on minority voters. On the very day *Shelby County* issued, Texas announced that it would implement a strict voter-identification requirement that had failed to clear Section 5. See Elmendorf & Spencer, Administering Section 2 of

the Voting Rights Act After *Shelby County*, 115 Colum. L. Rev. 2143, 2145–2146 (2015). Other States—Alabama, Virginia, Mississippi—fell like dominoes, adopting measures similarly vulnerable to preclearance review. See *ibid.* The North Carolina Legislature, starting work the day after *Shelby County*, enacted a sweeping election bill eliminating same-day registration, forbidding out-of-precinct voting, and reducing early voting, including souls-to-the-polls Sundays. (That law went too far even without Section 5: A court struck it down because the State's legislators had a racially discriminatory purpose. *North Carolina State Conference of NAACP* v. *McCrory*, 831 F. 3d 204 (CA4 2016).) States and localities redistricted—drawing new boundary lines or replacing neighborhood-based seats with at-large seats—in ways guaranteed to reduce minority representation. See Elmendorf, 115 Colum. L. Rev., at 2146. And jurisdictions closed polling places in mostly minority areas, enhancing an already pronounced problem. See Brief for Leadership Conference on Civil and Human Rights et al. as *Amici Curiae* 14–15 (listing closure schemes); Pettigrew, The Racial Gap in Wait Times, 132 Pol. Sci. Q. 527, 527 (2017) (finding that lines in minority precincts are twice as long as in white ones, and that a minority voter is six times more likely to wait more than an hour).[2]

And that was just the first wave of post-*Shelby County*

_____

[2] Although causation is hard to establish definitively, those post-*Shelby County* changes appear to have reduced minority participation in the next election cycle. The most comprehensive study available found that in areas freed from Section 5 review, white turnout remained the same, but "minority participation dropped by 2.1 percentage points"—a stark reversal in direction from prior elections. Ang, Do 40-Year-Old Facts Still Matter?, 11 Am. Econ. J.: Applied Economics, No. 3, pp. 1, 35 (2019). The results, said the scholar who crunched the numbers, "provide early evidence that the Shelby ruling may jeopardize decades of voting rights progress." *Id.*, at 36. The election laws passed in *Shelby County*'s wake "may have negated many of the gains made under preclearance." *Ibid.*

laws. In recent months, State after State has taken up or enacted legislation erecting new barriers to voting. See Brennan Center for Justice, Voting Laws Roundup: May 2021 (online source archived at www.supremecourt.gov) (compiling legislation). Those laws shorten the time polls are open, both on Election Day and before. They impose new prerequisites to voting by mail, and shorten the windows to apply for and return mail ballots. They make it harder to register to vote, and easier to purge voters from the rolls. Two laws even ban handing out food or water to voters standing in line. Some of those restrictions may be lawful under the Voting Rights Act. But chances are that some have the kind of impact the Act was designed to prevent—that they make the political process less open to minority voters than to others.

So the Court decides this Voting Rights Act case at a perilous moment for the Nation's commitment to equal citizenship. It decides this case in an era of voting-rights retrenchment—when too many States and localities are restricting access to voting in ways that will predictably deprive members of minority groups of equal access to the ballot box. If "any racial discrimination in voting is too much," as the *Shelby County* Court recited, then the Act still has much to do. 570 U. S., at 557. Or more precisely, the fraction of the Act remaining—the Act as diminished by the Court's hand. Congress never meant for Section 2 to bear all of the weight of the Act's commitments. That provision looks to courts, not to the Executive Branch, to restrain discriminatory voting practices. And litigation is an after-the-fact remedy, incapable of providing relief until an election—usually, more than one election—has come and gone. See *id.*, at 572 (Ginsburg, J., dissenting). So Section 2 was supposed to be a back-up, for all its sweep and power. But after *Shelby County*, the vitality of Section 2—a "permanent, nationwide ban on racial discrimination in voting"—matters more than ever. *Id.*, at 557 (majority opinion). For after *Shelby*

*County*, Section 2 is what voters have left.

## II

Section 2, as drafted, is well-equipped to meet the challenge. Congress meant to eliminate all "discriminatory election systems or practices which operate, designedly or otherwise, to minimize or cancel out the voting strength and political effectiveness of minority groups." S. Rep. No. 97–417, p. 28 (1982) (S. Rep.). And that broad intent is manifest in the provision's broad text. As always, this Court's task is to read that language as Congress wrote it— to give the section all the scope and potency Congress drafted it to have. So I start by showing how Section 2's text requires courts to eradicate voting practices that make it harder for members of some races than of others to cast a vote, unless such a practice is necessary to support a strong state interest. I then show how far from that text the majority strays. Its analysis permits exactly the kind of vote suppression that Section 2, by its terms, rules out of bounds.

## A

Section 2, as relevant here, has two interlocking parts. Subsection (a) states the law's basic prohibition:

"No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U. S. C. §10301(a).

Subsection (b) then tells courts how to apply that bar—or otherwise said, when to find that an infringement of the voting right has occurred:

"A violation of subsection (a) is established if, based on

the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a given race] in that [those] members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." §10301(b).[3]

Those provisions have a great many words, and I address them further below. But their essential import is plain: Courts are to strike down voting rules that contribute to a racial disparity in the opportunity to vote, taking all the relevant circumstances into account.

The first thing to note about Section 2 is how far its prohibitory language sweeps. The provision bars any "voting qualification," any "prerequisite to voting," or any "standard, practice, or procedure" that "results in a denial or abridgement of the right" to "vote on account of race." The overlapping list of covered state actions makes clear that Section 2 extends to every kind of voting or election rule. Congress carved out nothing pertaining to "voter qualifications or the manner in which elections are conducted." *Holder* v. *Hall*, 512 U. S. 874, 922 (1994) (THOMAS, J., concurring in judgment). So, for example, the provision "covers all manner of registration requirements, the practices surrounding registration," the "locations of polling places, the times polls are open, the use of paper ballots as opposed to voting machines, and other similar aspects of the voting process that might be manipulated to deny any citizen the right to cast a ballot and have it properly counted." *Ibid.* All those rules and more come within the statute—so long as they result in a race-based "denial or abridgement" of the

———————
[3] A final sentence, not at issue here, specifies that the voting right provided does not entitle minority citizens to proportional representation in electoral offices. See *infra*, at 19, n. 6.

voting right.    And the "denial or abridgement" phrase speaks broadly too. "[A]bridgment necessarily means something more subtle and less drastic than the complete denial of the right to cast a ballot, denial being separately forbidden." *Bossier*, 528 U. S., at 359 (Souter, J., concurring in part and dissenting in part).  It means to "curtail," rather than take away, the voting right.  American Heritage Dictionary 4 (1969).

The "results in" language, connecting the covered voting rules to the prohibited voting abridgement, tells courts that they are to focus on the law's effects.  Rather than hinge liability on state officials' motives, Congress made it ride on their actions' consequences.  That decision was as considered as considered comes.  This Court, as the majority notes, had construed the original Section 2 to apply to facially neutral voting practices "only if [they were] motivated by a discriminatory purpose." *Bolden*, 446 U. S., at 62; see *ante*, at 5.  Congress enacted the current Section 2 to reverse that outcome—to make clear that "results" alone could lead to liability.  An intent test, the Senate Report explained, "asks the wrong question." S. Rep., at 36.  If minority citizens "are denied a fair opportunity to participate," then "the system should be changed, regardless of" what "motives were in an official's mind." *Ibid.*  Congress also saw an intent test as imposing "an inordinately difficult burden for plaintiffs." *Ibid.*  Even if state actors had purposefully discriminated, they would likely be "ab[le] to offer a non-racial rationalization," supported by "a false trail" of "official resolutions" and "other legislative history eschewing any racial motive." *Id.*, at 37.  So only a results-focused statute could prevent States from finding ways to abridge minority citizens' voting rights.

But when to conclude—looking to effects, not purposes— that a denial or abridgment has occurred?  Again, answering that question is subsection (b)'s function.  See *supra*, at 12–13.  It teaches that a violation is established when,

"based on the totality of circumstances," a State's electoral system is "not equally open" to members of a racial group. And then the subsection tells us what that means. A system is not equally open if members of one race have "less opportunity" than others to cast votes, to participate in politics, or to elect representatives. The key demand, then, is for equal political opportunity across races.

That equal "opportunity" is absent when a law or practice makes it harder for members of one racial group, than for others, to cast ballots. When Congress amended Section 2, the word "opportunity" meant what it also does today: "a favorable or advantageous combination of circumstances" for some action. See American Heritage Dictionary, at 922. In using that word, Congress made clear that the Voting Rights Act does not demand equal outcomes. If members of different races have the same opportunity to vote, but go to the ballot box at different rates, then so be it—that is their preference, and Section 2 has nothing to say. But if a law produces different voting opportunities across races—if it establishes rules and conditions of political participation that are less favorable (or advantageous) for one racial group than for others—then Section 2 kicks in. It applies, in short, whenever the law makes it harder for citizens of one race than of others to cast a vote.[4]

And that is so even if (as is usually true) the law does not

———————

[4] I agree with the majority that "very small differences" among racial groups do not matter. *Ante*, at 18. Some racial disparities are too small to support a finding of unequal access because they are not statistically significant—that is, because they might have arisen from chance alone. See *Matrixx Initiatives*, *Inc.* v. *Siracusano*, 563 U. S. 27, 39 (2011). The statistical significance test is standard in all legal contexts addressing disparate impact. See *Ricci* v. *DeStefano*, 557 U. S. 557, 587 (2009). In addition, there may be some threshold of what is sometimes called "practical significance"—a level of inequality that, even if statistically meaningful, is just too trivial for the legal system to care about. See Federal Judicial Center, Reference Manual on Scientific Evidence 252 (3d ed. 2011) (discussing differences that are not "practically important").

single out any race, but instead is facially neutral. Suppose, as Justice Scalia once did, that a county has a law limiting "voter registration [to] only three hours one day a week." *Chisom*, 501 U. S., at 408 (dissenting opinion). And suppose that policy makes it "more difficult for blacks to register than whites"—say, because the jobs African Americans disproportionately hold make it harder to take time off in that window. *Ibid.* Those citizens, Justice Scalia concluded, would then "have less opportunity 'to participate in the political process' than whites, and §2 would therefore be violated." *Ibid.* (emphasis deleted). In enacting Section 2, Congress documented many similar (if less extreme) facially neutral rules—"registration requirements," "voting and registration hours," voter "purging" policies, and so forth—that create disparities in voting opportunities. S. Rep., at 10, n. 22; H. R. Rep. No. 97–227, pp. 11–17 (1981) (H. R. Rep.). Those laws, Congress thought, would violate Section 2, though they were not facially discriminatory, because they gave voters of different races unequal access to the political process.

Congress also made plain, in calling for a totality-of-circumstances inquiry, that equal voting opportunity is a function of both law and background conditions—in other words, that a voting rule's validity depends on how the rule operates in conjunction with facts on the ground. "[T]otality review," this Court has explained, stems from Congress's recognition of "the demonstrated ingenuity of state and local governments in hobbling minority voting power." *Johnson* v. *De Grandy*, 512 U. S. 997, 1018 (1994). Sometimes, of course, state actions overtly target a single race: For example, Congress was acutely aware, in amending Section 2, of the elimination of polling places in African American neighborhoods. See S. Rep., at 10, 11, and n. 22; H. R. Rep., at 17, 35. But sometimes government officials enact facially neutral laws that leverage—and become discriminatory by dint of—pre-existing social and economic

conditions. The classic historical cases are literacy tests and poll taxes. A more modern example is the one Justice Scalia gave, of limited registration hours. Congress knew how those laws worked: It saw that "inferior education, poor employment opportunities, and low incomes"—all conditions often correlated with race—could turn even an ordinary-seeming election rule into an effective barrier to minority voting in certain circumstances. *Thornburg* v. *Gingles*, 478 U. S. 30, 69 (1986) (plurality opinion). So Congress demanded, as this Court has recognized, "an intensely local appraisal" of a rule's impact—"a searching practical evaluation of the 'past and present reality.'" *Id.*, at 79; *De Grandy*, 512 U. S., at 1018 (quoting S. Rep., at 30). "The essence of a §2 claim," we have said, is that an election law "interacts with social and historical conditions" in a particular place to cause race-based inequality in voting opportunity. *Gingles*, 478 U. S., at 47 (majority opinion). That interaction is what the totality inquiry is mostly designed to discover.

At the same time, the totality inquiry enables courts to take into account strong state interests supporting an election rule. An all-things-considered inquiry, we have explained, is by its nature flexible. See *De Grandy*, 512 U. S., at 1018. On the one hand, it allows no "safe harbor[s]" for election rules resulting in discrimination. *Ibid.* On the other hand, it precludes automatic condemnation of those rules. Among the "balance of considerations" a court is to weigh is a State's need for the challenged policy. *Houston Lawyers' Assn.* v. *Attorney General of Tex.*, 501 U. S. 419, 427 (1991). But in making that assessment of state interests, a court must keep in mind—just as Congress did—the ease of "offer[ing] a non-racial rationalization" for even blatantly discriminatory laws. S. Rep., at 37; see *supra*, at 14. State interests do not get accepted on faith. And even a genuine and strong interest will not suffice if a plaintiff can prove that it can be accomplished in a less discriminatory

way. As we have put the point before: When a less racially biased law would not "significantly impair[] the State's interest," the discriminatory election rule must fall. *Houston Lawyers' Assn.*, 501 U. S., at 428.[5]

So the text of Section 2, as applied in our precedents, tells us the following, every part of which speaks to the ambition of Congress's action. Section 2 applies to any voting rule, of any kind. The provision prohibits not just the denial but also the abridgment of a citizen's voting rights on account of race. The inquiry is focused on effects: It asks not about why state officials enacted a rule, but about whether that rule results in racial discrimination. The discrimination that is of concern is inequality of voting opportunity. That kind of discrimination can arise from facially neutral (not just targeted) rules. There is a Section 2 problem when an

---

[5] The majority pretends that *Houston Lawyers' Assn.* did not ask about the availability of a less discriminatory means of serving the State's end, see *ante*, at 23, n. 16—but the inquiry is right there on page 428 (examining "if [the] impairment of a minority group's voting strength could be remedied without significantly impairing the State's interest in electing judges on a district-wide basis"). In posing that question, the Court did what Congress wanted, because absent a necessity test, States could too easily get away with offering "non-racial" but pretextual "rationalization[s]." S. Rep., at 37; see *supra*, at 14. And the Court did what it always does in applying laws barring discriminatory effects—ask whether a challenged policy is necessary to achieve the asserted goal. See *infra*, at 26.

Contrary to the majority's view, that kind of inquiry would not result in "invalidat[ing] just about any voting rule a State adopts." *Ante*, at 24. A plaintiff bears the burden of showing that a less discriminatory law would be "at least as effective in achieving the [State's] legitimate purpose." *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 874 (1997). And "cost may be an important factor" in that analysis, so the plaintiff could not (as the majority proposes) say merely that the State can combat fraud by "hiring more investigators and prosecutors." *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682, 730 (2014); *ante*, at 24. Given those features of the alternative-means inquiry, a State that tries both to serve its electoral interests and to give its minority citizens equal electoral access will rarely have anything to fear from a Section 2 suit.

election rule, operating against the backdrop of historical, social, and economic conditions, makes it harder for minority citizens than for others to cast ballots. And strong state interests may save an otherwise discriminatory rule, but only if that rule is needed to achieve them—that is, only if a less discriminatory rule will not attain the State's goal.

That is a lot of law to apply in a Section 2 case. Real law—the kind created by Congress. (A strange thing, to hear about it all only in a dissent.)[6] None of this law threatens to "take down," as the majority charges, the mass of state and local election rules. *Ante*, at 25. Here is the flipside of what I have said above, now from the plaintiff's perspective: Section 2 demands proof of a statistically significant racial disparity in electoral opportunities (not

———————

[6] Contra the majority, see *ante*, at 5–6, 22, and n. 14, the House-Senate compromise reached in amending Section 2 has nothing to do with the law relevant here. The majority is hazy about the content of this compromise for a reason: It was about proportional representation. As then-Justice Rehnquist explained, members of the Senate expressed concern that the "results in" language of the House-passed bill would provide not "merely for equal 'access' to the political process" but also "for proportional representation" of minority voters. *Mississippi Republican Executive Committee* v. *Brooks*, 469 U. S. 1002, 1010 (1984) (dissenting opinion). Senator Dole's solution was to add text making clear that minority voters had a right to equal voting opportunities, but no right to elect minority candidates "in numbers equal to their proportion in the population." 52 U. S. C. §10301(b). The Dole Amendment, as Justice Rehnquist noted, ensured that under the "results in" language equal "'access' only was required." 469 U. S., at 1010–1011; see 128 Cong. Rec. 14132 (1982) (Sen. Dole explaining that as amended "the focus of the standard is on whether there is equal access to the political process, not on whether members of a particular minority group have achieved proportional election results"). Nothing—literally nothing—suggests that the Senate wanted to water down the equal-access right that everyone agreed the House's language covered. So the majority is dead wrong to say that I want to "undo" the House-Senate compromise. *Ante*, at 22. It is the majority that wants to transform that compromise to support a view of Section 2 held in neither the House nor the Senate.

outcomes) resulting from a law not needed to achieve a government's legitimate goals.  That showing is hardly insubstantial; and as a result, Section 2 vote denial suits do not often succeed (even with lower courts applying the law as written, not the majority's new, concocted version).  See Brief for State and Local Election Officials as *Amici Curiae* 15 (finding only nine winning cases since *Shelby County*, each involving "an intensely local appraisal" of a "controversial polic[y] in specific places").  But Section 2 was indeed meant to do something important—crucial to the operation of our democracy.  The provision tells courts— however "radical" the majority might find the idea, *ante*, at 25—to eliminate facially neutral (as well as targeted) electoral rules that unnecessarily create inequalities of access to the political process.  That is the very project of the statute, as conceived and as written—and now as damaged by this Court.

## B

The majority's opinion mostly inhabits a law-free zone.  It congratulates itself in advance for giving Section 2's text "careful consideration."  *Ante*, at 14.  And then it leaves that language almost wholly behind.  See *ante*, at 14–21.  (Every once in a while, when its lawmaking threatens to leap off the page, it thinks to sprinkle in a few random statutory words.)  So too the majority barely mentions this Court's precedents construing Section 2's text.   On both those counts, you can see why.  As just described, Section 2's language is broad.  See *supra*, at 12–20.  To read it fairly, then, is to read it broadly.  And to read it broadly is to do much that the majority is determined to avoid.  So the majority ignores the sweep of Section 2's prohibitory language.  It fails to note Section 2's application to every conceivable kind of voting rule.  It neglects to address the provision's concern with how those rules may "abridge[]," not just

deny, minority citizens' voting rights. It declines to consider Congress's use of an effects test, rather than a purpose test, to assess the rules' legality. Nor does the majority acknowledge the force of Section 2's implementing provision. The majority says as little as possible about what it means for voting to be "equally open," or for voters to have an equal "opportunity" to cast a ballot. See *ante*, at 14–15. It only grudgingly accepts—and then apparently forgets— that the provision applies to facially neutral laws with discriminatory consequences. Compare *ante*, at 22, with *ante*, at 25. And it hints that as long as a voting system is sufficiently "open," it need not be equally so. See *ante*, at 16, 18. In sum, the majority skates over the strong words Congress drafted to accomplish its equally strong purpose: ensuring that minority citizens can access the electoral system as easily as whites.[7]

The majority instead founds its decision on a list of mostly made-up factors, at odds with Section 2 itself. To excuse this unusual free-form exercise, the majority notes

---

[7] In a single sentence, the majority huffs that "nobody disputes" various of these "points of law." *Ante*, at 21. Excellent! I only wish the majority would take them to heart, both individually and in combination. For example, the majority says it agrees that Section 2 reaches beyond denials of voting to any "abridgement." But then, as I'll later discuss, it insists that Section 2 has an interest only in rules that "block or seriously hinder voting"—which appears to create a "denial or *serious* abridgement" standard. *Ante*, at 16; see *infra*, at 22–23. Or, for example, the majority says it accepts that Section 2 may prohibit facially neutral election rules. But the majority takes every opportunity of casting doubt on those applications. Each facially neutral rule it mentions is one that it "doubt[s]" Congress could have "intended to uproot." *Ante*, at 18; see *ante*, at 6, 18, 21, 25. And it criticizes this dissent for understanding the statute (but how could anyone understand it differently?) as focusing on the racially "disparate impact" of neutral election rules on the opportunity to vote. *Ante*, at 21. Most fundamentally, the majority refuses to acknowledge how all the "points of law" it professes to agree with work in tandem to signal a statute of significant power and scope.

that Section 2 authorizes courts to conduct a "totality of cir-
cumstances" analysis. *Ante*, at 16. But as described above,
Congress mainly added that language so that Section 2
could protect against "the demonstrated ingenuity of state
and local governments in hobbling minority voting power."
*De Grandy*, 512 U. S., at 1018; see *supra*, at 16–17. The
totality inquiry requires courts to explore how ordinary-
seeming laws can interact with local conditions—economic,
social, historical—to produce race-based voting inequali-
ties. That inquiry hardly gives a court the license to devise
whatever limitations on Section 2's reach it would have
liked Congress to enact. But that is the license the majority
takes. The "important circumstances" it invents all cut in
one direction—toward limiting liability for race-based vot-
ing inequalities. *Ante*, at 16. (Indeed, the majority gratui-
tously dismisses several factors that point the opposite way.
See *ante*, at 19–21.) Think of the majority's list as a set of
extra-textual restrictions on Section 2—methods of coun-
teracting the law Congress actually drafted to achieve the
purposes *Congress* thought "important." The list—not a
test, the majority hastens to assure us, with delusions of
modesty—stacks the deck against minority citizens' voting
rights. Never mind that Congress drafted a statute to pro-
tect those rights—to prohibit any number of schemes the
majority's non-test test makes it possible to save.

Start with the majority's first idea: a "[m]ere inconven-
ience[]" exception to Section 2. *Ante*, at 16. Voting, the ma-
jority says, imposes a set of "usual burdens": Some time,
some travel, some rule compliance. *Ibid*. And all of that is
beneath the notice of Section 2—even if those burdens fall
highly unequally on members of different races. See *ibid*.
But that categorical exclusion, for seemingly small (or
"[un]usual" or "[un]serious") burdens, is nowhere in the pro-
vision's text. To the contrary (and as this Court has recog-
nized before), Section 2 allows no "safe harbor[s]" for elec-
tion rules resulting in disparate voting opportunities. *De*

*Grandy*, 512 U. S., at 1018; see *supra*, at 17. The section applies to *any* discriminatory "voting qualification," "prerequisite to voting," or "standard, practice, or procedure"— even the kind creating only (what the majority thinks of as) an ordinary burden. And the section cares about *any* race-based "abridgments" of voting, not just measures that come near to preventing that activity. Congress, recall, was intent on eradicating the "subtle, as well as the obvious," ways of suppressing minority voting. *Allen*, 393 U. S., at 565; see *supra*, at 14. One of those more subtle ways is to impose "inconveniences," especially a collection of them, differentially affecting members of one race. The certain result—because every inconvenience makes voting both somewhat more difficult and somewhat less likely—will be to deter minority votes. In countenancing such an election system, the majority departs from Congress's vision, set down in text, of ensuring equal voting opportunity. It chooses equality-lite.

And what is a "mere inconvenience" or "usual burden" anyway? The drafters of the Voting Rights Act understood that "social and historical conditions," including disparities in education, wealth, and employment, often affect opportunities to vote. *Gingles*, 478 U. S., at 47; see *supra*, at 16– 17. What does not prevent one citizen from casting a vote might prevent another. How is a judge supposed to draw an "inconvenience" line in some reasonable place, taking those differences into account? Consider a law banning the handing out of water to voters. No more than—or not even—an inconvenience when lines are short; but what of when they are, as in some neighborhoods, hours-long? The point here is that judges lack an objective way to decide which voting obstacles are "mere" and which are not, for all voters at all times. And so Section 2 does not ask the question.

The majority's "multiple ways to vote" factor is similarly flawed. *Ante*, at 18. True enough, a State with three ways

to vote (say, on Election Day; early in person; or by mail) may be more "open" than a State with only one (on Election Day). And some other statute might care about that. But Section 2 does not. What it cares about is that a State's "political processes" are "*equally* open" to voters of all races. And a State's electoral process is not equally open if, for example, the State "only" makes Election Day voting by members of one race peculiarly difficult. The House Report on Section 2 addresses that issue. It explains that an election system would violate Section 2 if minority citizens had a lesser opportunity than white citizens to use absentee ballots. See H. R. Rep., at 31, n. 106. Even if the minority citizens could just as easily vote in person, the scheme would "result in unequal access to the political process." *Id.*, at 31. That is not some piece of contestable legislative history. It is the only reading of Section 2 possible, given the statute's focus on equality. Maybe the majority does not mean to contest that proposition; its discussion of this supposed factor is short and cryptic. But if the majority does intend to excuse so much discrimination, it is wrong. Making one method of voting less available to minority citizens than to whites necessarily means giving the former "less opportunity than other members of the electorate to participate in the political process." §10301(b).

The majority's history-and-commonality factor also pushes the inquiry away from what the statute demands. The oddest part of the majority's analysis is the idea that "what was standard practice when §2 was amended in 1982 is a relevant consideration." *Ante*, at 16. The 1982 state of the world is no part of the Section 2 test. An election rule prevalent at that time may make voting harder for minority than for white citizens; Section 2 then covers such a rule, as it covers any other. And contrary to the majority's unsupported speculation, Congress "intended" exactly that. *Ante*, at 17; see H. R. Rep., at 14 (explaining that the Act aimed to eradicate the "numerous practices and procedures which

act as continued barriers to registration and voting").[8]  Section 2 was meant to disrupt the status quo, not to preserve it—to eradicate then-current discriminatory practices, not to set them in amber.  See *Bossier*, 528 U. S., at 334 (under Section 2, "[i]f the *status quo*" abridges the right to vote "relative to what the right to vote *ought to be*, the status quo itself must be changed").[9]  And as to election rules common now, the majority oversimplifies.  Even if those rules are unlikely to violate Section 2 everywhere, they may easily do so somewhere.  That is because the demographics and political geography of States vary widely and Section 2's application depends on place-specific facts.  As we have recognized, the statute calls for "an intensely local appraisal," not a count-up-the-States exercise.  *Gingles*, 478 U. S., at 79; see *supra*, at 17.  This case, as I'll later discuss, offers a perfect illustration of how the difference between those two approaches can matter.  See *infra*, at 29–40.

———————

[8] The House Report listed some of those offensive, even though facially neutral and then-prevalent, practices: "inconvenient location and hours of registration, dual registration for county and city elections," "frequent and unnecessary purgings and burdensome registration requirements, and failure to provide . . . assistance to illiterates."  H. R. Rep., at 14.  So too the Senate Report complained of "inconvenient voting and registration hours" and "reregistration requirements and purging of voters."  S. Rep., at 10, n. 22; see *supra*, at 16.

[9] Even setting aside Section 2's status-quo-disrupting lean, this Court has long rejected—including just last Term—the majority's claim that the state of the world at the time of a statute's enactment provides a useful "benchmark[ ]" when applying a broadly written law.  *Ante*, at 17.  Such a law will typically come to encompass applications—even "important" ones—that were not "foreseen at the time of enactment."  *Bostock* v. *Clayton County*, 590 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 26).  To prevent that from happening—as the majority does today, on the ground that Congress simply must have "intended" it—is "to displace the plain meaning of the law in favor of something lying behind it."  *Ibid*.; see *id*., at \_\_\_ (slip op., at 30) (When a law is "written in starkly broad terms," it is "virtually guaranteed that unexpected applications [will] emerge over time").

That leaves only the majority's discussion of state interests, which is again skewed so as to limit Section 2 liability. No doubt that under our precedent, a state interest in an election rule "is a legitimate factor to be considered." *Houston Lawyers' Assn.*, 501 U. S., at 426. But the majority wrongly dismisses the need for the closest possible fit between means and end—that is, between the terms of the rule and the State's asserted interest. *Ante*, at 21. In the past, this Court has stated that a discriminatory election rule must fall, no matter how weighty the interest claimed, if a less biased law would not "significantly impair[ that] interest." *Houston Lawyers' Assn.*, 501 U. S., at 428; see *supra*, at 17–18, and n. 5. And as the majority concedes, we apply that kind of means-end standard in every other context—employment, housing, banking—where the law addresses racially discriminatory effects: There, the rule must be "strict[ly] necess[ary]" to the interest. *Ante*, at 21; see, *e.g.*, *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 425 (1975) (holding that an employment policy cannot stand if another policy, "without a similarly undesirable racial effect, would also serve the employer's legitimate interest"). The majority argues that "[t]he text of [those] provisions" differs from Section 2's. *Ante*, at 20. But if anything, Section 2 gives less weight to competing interests: Unlike in most discrimination laws, they enter the inquiry only through the provision's reference to the "totality of circumstances"—through, then, a statutory backdoor. So the majority falls back on the idea that "[d]emanding such a tight fit would have the effect of invalidating a great many neutral voting regulations." *Ante*, at 21; see *ante*, at 25. But a state interest becomes relevant only when a voting rule, even if neutral on its face, is found *not* neutral in operation—only, that is, when the rule provides unequal access to the political process. Apparently, the majority does not want to "invalidate [too] many" of those actually discriminatory rules. But Congress had a different goal in enacting

Section 2.

The majority's approach, which would ask only whether a discriminatory law "*reasonably* pursue[s] important state interests," gives election officials too easy an escape from Section 2. *Ante*, at 25 (emphasis added). Of course preventing voter intimidation is an important state interest. And of course preventing election fraud is the same. But those interests are also easy to assert groundlessly or pretextually in voting discrimination cases. Congress knew that when it passed Section 2. Election officials can all too often, the Senate Report noted, "offer a non-racial rationalization" for even laws that "purposely discriminate[]." S. Rep., at 37; see *supra*, at 14, 17–18, and n. 5. A necessity test filters out those offerings. See, *e.g.*, *Albemarle*, 422 U. S., at 425. It thereby prevents election officials from flouting, circumventing, or discounting Section 2's command not to discriminate.

In that regard, the past offers a lesson to the present. Throughout American history, election officials have asserted anti-fraud interests in using voter suppression laws. Poll taxes, the classic mechanism to keep black people from voting, were often justified as "preserv[ing] the purity of the ballot box [and] facilitat[ing] honest elections." J. Kousser, The Shaping of Southern Politics 111, n. 9 (1974). A raft of election regulations—including "elaborate registration procedures" and "early poll closings"—similarly excluded white immigrants (Irish, Italians, and so on) from the polls on the ground of "prevent[ing] fraud and corruption." Keyssar 159; see *ibid.* (noting that in those times "claims of widespread corruption" were backed "almost entirely" by "anecdotes [with] little systematic investigation or evidence"). Take even the majority's example of a policy advancing an "important state interest": "the use of private voting booths," in which voters marked their own ballots. *Ante*, at 19. In the majority's high-minded account, that innovation—then known as the Australian voting system, for the

country that introduced it—served entirely to prevent undue influence. But when adopted, it also prevented many illiterate citizens—especially African Americans—from voting. And indeed, that was partly the point. As an 1892 Arkansas song went:

> The Australian Ballot works like a charm,
> It makes them think and scratch,
> And when a Negro gets a ballot
> He has certainly got his match.

Kousser 54. Across the South, the Australian ballot decreased voter participation among whites by anywhere from 8% to 28% but among African Americans by anywhere from 15% to 45%. See *id.*, at 56. Does that mean secret ballot laws violate Section 2 today? Of course not. But should the majority's own example give us all a bit of pause? Yes, it should. It serves as a reminder that States have always found it natural to wrap discriminatory policies in election-integrity garb.

Congress enacted Section 2 to prevent those maneuvers from working. It knew that States and localities had over time enacted measure after measure imposing discriminatory voting burdens. And it knew that governments were proficient in justifying those measures on non-racial grounds. So Congress called a halt. It enacted a statute that would strike down all unnecessary laws, including facially neutral ones, that result in members of a racial group having unequal access to the political process.

But the majority is out of sympathy with that measure. The majority thinks a statute that would remove those laws is not, as Justice Ginsburg once called it, "consequential, efficacious, and amply justified." *Shelby County*, 570 U. S., at 562 (dissenting opinion). Instead, the majority thinks it too "radical" to stomach. *Ante*, at 21, 25. The majority objects to an excessive "transfer of the authority to set voting rules from the States to the federal courts." *Ante*, at 25. It

even sees that transfer as "[un]democratic." *Ibid*. But maybe the majority should pay more attention to the "historical background" that it insists "does not tell us how to decide this case." *Ante*, at 21. That history makes clear the incongruity, in interpreting this statute, of the majority's paean to state authority—and conversely, its denigration of federal responsibility for ensuring non-discriminatory voting rules. The Voting Rights Act was meant to replace state and local election rules that needlessly make voting harder for members of one race than for others. The text of the Act perfectly reflects that objective. The "democratic" principle it upholds is not one of States' rights as against federal courts. The democratic principle it upholds is the right of every American, of every race, to have equal access to the ballot box. The majority today undermines that principle as it refuses to apply the terms of the statute. By declaring some racially discriminatory burdens inconsequential, and by refusing to subject asserted state interests to serious means-end scrutiny, the majority enables voting discrimination.

## III

Just look at Arizona. Two of that State's policies disproportionately affect minority citizens' opportunity to vote. The first—the out-of-precinct policy—results in Hispanic and African American voters' ballots being thrown out at a statistically higher rate than those of whites. And whatever the majority might say about the ordinariness of such a rule, Arizona applies it in extra-ordinary fashion: Arizona is *the* national outlier in dealing with out-of-precinct votes, with the next-worst offender nowhere in sight. The second rule—the ballot-collection ban—makes voting meaningfully more difficult for Native American citizens than for others. And nothing about how that ban is applied is "usual" either—this time because of how many of the

State's Native American citizens need to travel long distances to use the mail. Both policies violate Section 2, on a straightforward application of its text. Considering the "totality of circumstances," both "result in" members of some races having "less opportunity than other members of the electorate to participate in the political process and to elect a representative of their choice." §10301(b). The majority reaches the opposite conclusion because it closes its eyes to the facts on the ground.[10]

### A

Arizona's out-of-precinct policy requires discarding any Election Day ballot cast elsewhere than in a voter's assigned precinct. Under the policy, officials throw out every choice in every race—including national or statewide races (*e.g.*, for President or Governor) that appear identically on every precinct's ballot. The question is whether that policy unequally affects minority citizens' opportunity to cast a vote.

Although the majority portrays Arizona's use of the rule as "unremarkable," *ante*, at 26, the State is in fact a national aberration when it comes to discarding out-of-precinct ballots. In 2012, about 35,000 ballots across the country were thrown out because they were cast at the wrong precinct. See U. S. Election Assistance Commission, 2012 Election Administration and Voting Survey 53 (2013). Nearly one in three of those discarded votes—10,979—was cast in Arizona. *Id.*, at 52. As the Court of Appeals concluded, and the chart below indicates, Arizona threw away ballots in that year at 11 times the rate of the second-place discarder (Washington State). *Democratic Nat. Committee* v. *Hobbs*, 948 F. 3d 989, 1001 (CA9 2020); see App. 72. Somehow the majority labels that difference "marginal[],"

---

[10] Because I would affirm the Court of Appeals' holding that the effects of these policies violate Section 2, I need not pass on that court's alternative holding that the laws were enacted with discriminatory intent.

*ante,* at 27, but it is anything but. More recently, the number of discarded ballots in the State has gotten smaller: Arizona counties have increasingly abandoned precinct-based voting (in favor of county-wide "vote centers"), so the out-of-precinct rule has fewer votes to operate on. And the majority primarily relies on those latest (2016) numbers. But across the five elections at issue in this litigation (2008–2016), Arizona threw away far more out-of-precinct votes—almost 40,000—than did any other State in the country.

**Figure 6: Rejected out-of-precinct ballots as a share of in-person ballots cast according to 2012 EAC Report**



Votes in such numbers can matter—enough for Section 2 to apply. The majority obliquely suggests not, comparing the smallish number of thrown-out votes (minority and non-minority alike) to the far larger number of votes cast and

counted. See *ante*, at 27. But elections are often fought and won at the margins—certainly in Arizona. Consider the number of votes separating the two presidential candidates in the most recent election: 10,457. That is fewer votes than Arizona discarded under the out-of-precinct policy in two of the prior three presidential elections. This Court previously rejected the idea—the "erroneous assumption"—"that a small group of voters can never influence the outcome of an election." *Chisom*, 501 U. S., at 397, n. 24. For that reason, we held that even "a small minority" group can claim Section 2 protection. See *ibid*. Similarly here, the out-of-precinct policy—which discards thousands upon thousands of ballots in every election—affects more than sufficient votes to implicate Section 2's guarantee of equal electoral opportunity.

And the out-of-precinct policy operates unequally: Ballots cast by minorities are more likely to be discarded. In 2016, Hispanics, African Americans, and Native Americans were about twice as likely—or said another way, 100% more likely—to have their ballots discarded than whites. See App. 122. And it is possible to break that down a bit. Sixty percent of the voting in Arizona is from Maricopa County. There, Hispanics were 110% more likely, African Americans 86% more likely, and Native Americans 73% more likely to have their ballots tossed. See *id*., at 153. Pima County, the next largest county, provides another 15% of the statewide vote. There, Hispanics were 148% more likely, African Americans 80% more likely, and Native Americans 74% more likely to lose their votes. See *id*., at 157. The record does not contain statewide figures for 2012. But in Maricopa and Pima Counties, the percentages were about the same as in 2016. See *id*., at 87, 91. Assessing those disparities, the plaintiffs' expert found, and the District Court accepted, that the discriminatory impact of the out-of-precinct policy was statistically significant—meaning, again, that it was highly unlikely to occur by chance.

See *Democratic Nat. Committee* v. *Reagan*, 329 F. Supp. 3d 824, 871 (Ariz. 2018); *supra*, at 15, n. 4.

The majority is wrong to assert that those statistics are "highly misleading." *Ante*, at 28. In the majority's view, they can be dismissed because the great mass of voters are unaffected by the out-of-precinct policy. See *ibid*. But Section 2 is less interested in "absolute terms" (as the majority calls them) than in relative ones. *Ante*, at 27; see *supra*, at 14–15. Arizona's policy creates a statistically significant disparity between minority and white voters: Because of the policy, members of different racial groups do not in fact have an equal likelihood of having their ballots counted. Suppose a State decided to throw out 1% of the Hispanic vote each election. Presumably, the majority would not approve the action just because 99% of the Hispanic vote is unaffected. Nor would the majority say that Hispanics in that system have an equal shot of casting an effective ballot. Here, the policy is not so overt; but under Section 2, that difference does not matter. Because the policy "results in" statistically significant inequality, it implicates Section 2. And the kind of inequality that the policy produces is not the kind only a statistician could see. A rule that throws out, each and every election, thousands of votes cast by minority citizens is a rule that can affect election outcomes. If you were a minority vote suppressor in Arizona or elsewhere, you would want that rule in your bag of tricks. You would not think it remotely irrelevant.

And the case against Arizona's policy grows only stronger the deeper one digs. The majority fails to conduct the "searching practical evaluation" of "past and present reality" that Section 2's "totality of circumstances" inquiry demands. *De Grandy*, 512 U. S., at 1018. Had the majority done so, it would have discovered why Arizona's out-of-precinct policy has such a racially disparate impact on voting opportunity. Much of the story has to do with the siting and shifting of polling places. Arizona moves polling places

at a startling rate. Maricopa County (recall, Arizona's largest by far) changed 40% or more of polling places before both the 2008 and the 2012 elections. See 329 F. Supp. 3d, at 858 (noting also that changes "continued to occur in 2016"). In 2012 (the election with the best data), voters affected by those changes had an out-of-precinct voting rate that was 40% higher than other voters did. See *ibid.* And, critically, Maricopa's relocations hit minority voters harder than others. In 2012, the county moved polling stations in African American and Hispanic neighborhoods 30% more often than in white ones. See App. 110–111. The odds of those changes leading to mistakes increased yet further because the affected areas are home to citizens with relatively low education and income levels. See *id.*, at 170–171. And even putting relocations aside, the siting of polling stations in minority areas caused significant out-of-precinct voting. Hispanic and Native American voters had to travel further than white voters did to their assigned polling places. See *id.*, at 109. And all minority voters were disproportionately likely to be assigned to polling places other than the ones closest to where they lived. See *id.*, at 109, and n. 30, 175–176. Small wonder, given such siting decisions, that minority voters found it harder to identify and get to their correct precincts. But the majority does not address these matters.[11]

————————

[11] The majority's excuse for failing to consider the plaintiffs' evidence on Arizona's siting of polling places is that the plaintiffs did not bring a separate claim against those practices. See *ante*, at 30, n. 18. If that sounds odd, it is. The majority does not contest that the evidence on polling-place siting is relevant to the plaintiffs' challenge to the out-of-precinct policy. Nor could the majority do so. The siting practices are one of the background conditions against which the out-of-precinct policy operates—exactly the kind of thing that a totality-of-circumstances analysis demands a court take into account. To refuse to think about those practices because the plaintiffs might have brought a freestanding claim against them is to impose an out-of-thin-air pleading requirement that

Facts also undermine the State's asserted interests, which the majority hangs its hat on. A government interest, as even the majority recognizes, is "merely one factor to be considered" in Section 2's totality analysis. *Houston Lawyers' Assn.*, 501 U. S., at 427; see *ante*, at 19. Here, the State contends that it needs the out-of-precinct policy to support a precinct-based voting system. But 20 other States combine precinct-based systems with mechanisms for partially counting out-of-precinct ballots (that is, counting the votes for offices like President or Governor). And the District Court found that it would be "administratively feasible" for Arizona to join that group. 329 F. Supp. 3d, at 860. Arizona—echoed by the majority—objects that adopting a partial-counting approach would decrease compliance with the vote-in-your-precinct rule (by reducing the penalty for a voter's going elsewhere). But there is more than a little paradox in that response. We know from the extraordinary number of ballots Arizona discards that its current system fails utterly to "induce[] compliance." *Ante*, at 28–29; see *supra*, at 30–31. Presumably, that is because the system—most notably, its placement and shifting of polling places—sows an unparalleled level of voter confusion. A State that makes compliance with an election rule so unusually hard is in no position to claim that its interest in "induc[ing] compliance" outweighs the need to remedy the race-based discrimination that rule has caused.

B

Arizona's law mostly banning third-party ballot collection also results in a significant race-based disparity in voting opportunities. The problem with that law again lies in facts nearly unique to Arizona—here, the presence of rural Native American communities that lack ready access to mail

---

operates to exclude exactly the evidence that most strongly signals a Section 2 violation.

service.  Given that circumstance, the Arizona statute dis-
criminates in just the way Section 2 proscribes.  The major-
ity once more comes to a different conclusion only by ignor-
ing the local conditions with which Arizona's law interacts.

The critical facts for evaluating the ballot-collection rule
have to do with mail service.  Most Arizonans vote by mail.
But many rural Native American voters lack access to mail
service, to a degree hard for most of us to fathom.  Only 18%
of Native voters in rural counties receive home mail deliv-
ery, compared to 86% of white voters living in those coun-
ties.  See 329 F. Supp. 3d, at 836.  And for many or most,
there is no nearby post office.  Native Americans in rural
Arizona "often must travel 45 minutes to 2 hours just to get
to a mailbox."  948 F. 3d, at 1006; see 329 F. Supp. 3d, at
869 ("Ready access to reliable and secure mail service is
nonexistent" in some Native American communities).  And
between a quarter to a half of households in these Native
communities do not have a car.  See *ibid.*  So getting ballots
by mail and sending them back poses a serious challenge
for Arizona's rural Native Americans.[12]

For that reason, an unusually high rate of Native Ameri-
cans used to "return their early ballots with the assistance
of third parties."  *Id.*, at 870.[13]  As the District Court found:
"[F]or many Native Americans living in rural locations,"

_____

[12] Certain Hispanic communities in Arizona confront similar difficul-
ties.  For example, in the border town of San Luis, which is 98% Hispanic,
"[a]lmost 13,000 residents rely on a post office located across a major
highway" for their mail service.  329 F. Supp. 3d, at 869.  The median
income in San Luis is $22,000, so "many people [do] not own[] cars"—
making it "difficult" to "receiv[e] and send[] mail."  *Ibid.*

[13] The majority faults the plaintiffs for failing to provide "concrete" sta-
tistical evidence on this point.  See *ante*, at 31.  But no evidence of that
kind exists: Arizona has never compiled data on third-party ballot collec-
tion.  And the witness testimony the plaintiffs offered in its stead allowed
the District Court to conclude that minority voters, and especially Native
Americans, disproportionately needed third-party assistance to vote.
See 329 F. Supp. 3d, at 869–870.

voting "is an activity that requires the active assistance of friends and neighbors." *Ibid.* So in some Native communities, third-party collection of ballots—mostly by fellow clan members—became "standard practice." *Ibid.* And stopping it, as one tribal election official testified, "would be a huge devastation." *Ibid.*; see Brief for Navajo Nation as *Amicus Curiae* 19–20 (explaining that ballot collection is how Navajo voters "have historically handled their mail-in ballots").

Arizona has always regulated these activities to prevent fraud. State law makes it a felony offense for a ballot collector to fail to deliver a ballot. See Ariz. Rev. Stat. Ann. §16–1005 (Cum. Supp. 2020). It is also a felony for a ballot collector to tamper with a ballot in any manner. See *ibid.* And as the District Court found, "tamper evident envelopes and a rigorous voter signature verification procedure" protect against any such attempts. 329 F. Supp. 3d, at 854. For those reasons and others, no fraud involving ballot collection has ever come to light in the State. *Id.*, at 852.

Still, Arizona enacted—with full knowledge of the likely discriminatory consequences—the near-blanket ballot-collection ban challenged here. The first version of the law—much less stringent than the current one—passed the Arizona Legislature in 2011. But the Department of Justice, in its Section 5 review, expressed skepticism about the statute's compliance with the Voting Rights Act, and the legislature decided to repeal the law rather than see it blocked (and thereby incur statutory penalties). See 329 F. Supp. 3d, at 880; 52 U. S. C. §10303(a)(1)(E) (providing that if a state law fails Section 5 review, the State may not escape the preclearance process for another 10 years). Then, this Court decided *Shelby County*. With Section 5 gone, the State Legislature felt free to proceed with a new ballot-collection ban, despite the potentially discriminatory effects that the preclearance process had revealed. The enacted law contains limited exceptions for family members and caregivers. But it includes no similar exceptions for clan

members or others with Native kinship ties. They and anyone else who picks up a neighbor's ballot and takes it to a post office, or delivers it to an election site, is punishable as a felon. See Ariz. Rev. Stat. §16–1005(H).

Put all of that together, and Arizona's ballot-collection ban violates Section 2. The ban interacts with conditions on the ground—most crucially, disparate access to mail service—to create unequal voting opportunities for Native Americans. Recall that only 18% of rural Native Americans in the State have home delivery; that travel times of an hour or more to the nearest post office are common; that many members of the community do not have cars. See *supra*, at 36. Given those facts, the law prevents many Native Americans from making effective use of one of the principal means of voting in Arizona.[14] What is an inconsequential burden for others is for these citizens a severe hardship. And the State has shown no need for the law to go so far. Arizona, as noted above, already has statutes in place to deter fraudulent collection practices. See *supra*, at 37. Those laws give every sign of working. Arizona has not offered any evidence of fraud in ballot collection, or even an account of a harm threatening to happen. See 329 F. Supp. 3d, at 852 ("[T]here has never been a case of voter fraud associated with ballot collection charged in Arizona"). And anyway, Arizona did not have to entirely forego a ballot-collection restriction to comply with Section 2. It could, for

———————

[14] To make matters worse, in-person voting does not provide a feasible alternative for many rural Native voters. Given the low population density on Arizona's reservations, the distance to an assigned polling place—like that to a post office—is usually long. Again, many Native citizens do not own cars. And the State's polling-place siting practices cause some voters to go to the wrong precincts. Respecting the last factor, the District Court found that because Navajo voters "lack standard addresses[,] their precinct assignments" are "based upon guesswork." *Democratic Nat. Committee* v. *Reagan*, 329 F. Supp. 3d 824, 873 (Ariz. 2018). As a result, there is frequent "confusion about the voter's correct polling place." *Ibid.*

example, have added an exception to the statute for Native clan or kinship ties, to accommodate the special, "intensely local" situation of the rural Native American community. *Gingles*, 478 U. S., at 79. That Arizona did not do so shows, at best, selective indifference to the voting opportunities of its Native American citizens.

The majority's opinion fails to acknowledge any of these facts. It quotes extensively from the District Court's finding that the ballot-collection ban does not interfere with the voting opportunities of minority groups generally. See *ante*, at 31, n. 19. But it never addresses the court's separate finding that the ban poses a unique burden for Native Americans. See *supra*, at 36–37. Except in a pair of footnotes responding to this dissent, the term "Native American" appears once (count it, once) in the majority's five-page discussion of Arizona's ballot-collection ban. So of course that community's strikingly limited access to mail service is not addressed.[15] In the majority's alternate world, the

———————

[15] In one of those footnotes, the majority defends its omission by saying that "no individual [Native American] voter testified that [the collection ban] would make it significantly more difficult for him or her to vote." *Ante*, at 34, n. 21. But as stated above, the District Court found, based on the testimony of "lawmakers, elections officials[,] community advocates," and tribal representatives, that the ban would have that effect for many Native American voters. 329 F. Supp. 3d, at 868; see *id.*, at 870 ("[F]or many Native Americans living in rural locations," voting "is an activity that requires the active assistance of friends and neighbors"); *supra*, at 36–37. The idea that the claim here fails because the plaintiffs did not produce *less* meaningful evidence (a single person's experience) does not meet the straight-face standard. And the majority's remaining argument is, if anything, more eccentric. Here, the majority assures us that the Postal Service has a "statutory obligation[]" to provide "effective and regular postal services to rural areas." *Ante*, at 34, n. 21. But the record shows what the record shows—once again, in the Court of Appeals' words, that Native Americans in rural Arizona "often must travel 45 minutes to 2 hours just to get to a mailbox." *Democratic Nat. Committee* v. *Hobbs*, 948 F. 3d 989, 1006 (CA9 2020). That kind of background circumstance is central to Section 2's totality-of-circumstances

collection ban is just a "usual burden[] of voting" for every-one. *Ante*, at 30. And in that world, "[f]raud is a real risk" of ballot collection—as to every community, in every cir-cumstance—just because the State in litigation asserts that it is. *Ante*, at 33. The State need not even show that the discriminatory rule it enacted is necessary to prevent the fraud it purports to fear. So the State has no duty to sub-stitute a non-discriminatory rule that would adequately serve its professed goal. Like the rest of today's opinion, the majority's treatment of the collection ban thus flouts what Section 2 commands: the eradication of election rules re-sulting in unequal opportunities for minority voters.

### IV

Congress enacted the Voting Rights Act to address a deep fault of our democracy—the historical and continuing at-tempt to withhold from a race of citizens their fair share of influence on the political process. For a century, African Americans had struggled and sacrificed to wrest their vot-ing rights from a resistant Nation. The statute they and their allies at long last attained made a promise to all Americans. From then on, Congress demanded, the politi-cal process would be equally open to every citizen, regard-less of race.

One does not hear much in the majority opinion about that promise. One does not hear much about what brought Congress to enact the Voting Rights Act, what Congress hoped for it to achieve, and what obstacles to that vision remain today. One would never guess that the Act is, as the President who signed it wrote, "monumental." Johnson Papers 841. For all the opinion reveals, the majority might

_____

analysis—and here produces a significant racial disparity in the oppor-tunity to vote. The majority's argument to the contrary is no better than if it condoned a literacy test on the ground that a State had long had a statutory obligation to teach all its citizens to read and write.

KAGAN, J., dissenting

be considering any old piece of legislation—say, the Lanham Act or ERISA.

But then, at least, the majority should treat the Voting Rights Act as if it were ordinary legislation. The Court always says that it must interpret a statute according to its text—that it has no warrant to override congressional choices. But the majority today flouts those choices with abandon. The language of Section 2 is as broad as broad can be. It applies to any policy that "results in" disparate voting opportunities for minority citizens. It prohibits, without any need to show bad motive, even facially neutral laws that make voting harder for members of one race than of another, given their differing life circumstances. That is the expansive statute Congress wrote, and that our prior decisions have recognized. But the majority today lessens the law—cuts Section 2 down to its own preferred size. The majority creates a set of extra-textual exceptions and considerations to sap the Act's strength, and to save laws like Arizona's. No matter what Congress wanted, the majority has other ideas.

This Court has no right to remake Section 2. Maybe some think that vote suppression is a relic of history—and so the need for a potent Section 2 has come and gone. Cf. *Shelby County*, 570 U. S., at 547 ("[T]hings have changed dramatically"). But Congress gets to make that call. Because it has not done so, this Court's duty is to apply the law as it is written. The law that confronted one of this country's most enduring wrongs; pledged to give every American, of every race, an equal chance to participate in our democracy; and now stands as the crucial tool to achieve that goal. That law, of all laws, deserves the sweep and power Congress gave it. That law, of all laws, should not be diminished by this Court.